RIVIERE, D. D. S., INC., APPELLEE, *v.* THE STATE OF OHIO ET AL., APPELLANTS.

(No. 75AP-620—Decided June 17, 1976.)

*Mr. Richard S. Donahey* and *Mr. Jack R. Graf, Jr.*, for appellee.

*Mr. William J. Brown*, Attorney General, *Mr. Terry L. Tataru* and *Mr. Robert H. Stromberg*, for appellants.

McCORMAC, J. Plaintiff, the appellee herein, commenced an action against the state of Ohio, the Ohio Department of Public Welfare and Thomas E. Ferguson, Auditor of the state of Ohio, alleging that he had provided dental services to recipients of Medicaid and other medical assistance programs of the state of Ohio, administered through the Ohio Department of Public Welfare, and that defendants failed to pay the amount due under the contract. Plaintiff sought an injunction against defendants, restraining them from withholding the payments due plaintiff and judgment in the amount of $70,000. The Ohio Department of Public Welfare served a counterclaim for $277,423.

The Auditor then brought an original action of prohibition in this court against the trial court judge, asking that he be prohibited from hearing and determining the aforesaid case. This court, in case No. 75AP-194, on May 28, 1975, issued a limited writ of prohibition, prohibiting the Court of Common Pleas from proceeding with the action complained of against the state of Ohio, but permitting the Court of Common Pleas to proceed with the portion of the action seeking injunctive relief against the Auditor of the state and the Department of Welfare, as well as the counterclaim brought by the Department of Welfare. The reasons for that decision are set forth fully in the opinion.

Upon remand, under the limited writ of prohibition, the issues as to the injunction were decided in favor of plaintiff and it is our understanding that payment has been made to defendants. Payment had been withheld solely on the basis of the counterclaim as a set-off.

The Ohio Department of Public Welfare counterclaim demanded judgment against plaintiff in the amount of $277,423, which the department claimed had been over-

paid to appellee in the past for services rendered to welfare patients. The issues in the counterclaim were tried before a referee whose findings were adopted by the court. A judgment was entered in favor of plaintiff and a timely appeal has been taken.

Defendants set forth the following assignments of error:

"(1) The trial court erred in holding that the referee properly interpreted the pertinent sections of the federal regulations and it erred in adopting the report of the referee as its own decision and in finding against defendant Ohio Department of Public Welfare on the counterclaim.

"(2) The trial court erred in holding that judgment should issue in favor of plaintiff on his complaint.

"(3) The trial court erred in holding that it had jurisdiction to entertain plaintiff's complaint."

The first assignment of error in this case concerns the substantive matter at issue between the parties; that is, whether plaintiff was entitled to all the fees for dental services which were paid him by the Ohio Department of Public Welfare for the treatment of welfare patients. The amount which may be paid by the defendant department for each specific dental procedure or service rendered by a provider under the medical assistance program is controlled by Title 42, Section 1395, U. S. Code, and the applicable federal regulations. Plaintiff entered into a provider contract with the Ohio Department of Welfare to render dental services to welfare patients and, as a provider, was required to comply with federal and state law in his provider agreements.

In pertinent part, 45 C. F. R., Section 250.30 provides:

"(b) *upper limits.* The upper limits for payments for care and services under a medical assistance plan are as follows: * * *

"(3) (A) (1) Payment to the individual practitioner is limited to the lowest of (*i*) His actual charge for service; (*ii*) The median of his charge for a given service derived from claims processed or from claims for services rendered during all of the calendar year preceding the start of the

fiscal year in which the determination is made; or (*iii*) His reasonable charge recognized under part (B), title XVIII. * * *"

Reasonable charge is explained in 20 C. F. R., Section 405.502(a), which states in part:

The two criteria set out in the law which are considered in determining reasonable charges are:

"(1) The customary charges for similar services generally made by the physician or other person furnishing such services; and

"(2) The prevailing charges in the locality for similar services."

20 C. F. R., Section 405.503 defines customary charges as follows:

"(a) *Customary charge defined.* The term 'customary charges' will refer to the uniform amount which the individual physician or other person charges in the majority of cases for a specific medical procedure or service. In determining such uniform amount, token charges for charity patients and substandard charges for welfare and other low income patients are to be excluded. The reasonable charge cannot, except as provided in §405.506, be higher than the individual physician's or other person's customary charge."

The counterclaim was based on claimed higher payments than actually due for the period from 1968 through 1973, because it is contended that plaintiff charged the Ohio Department of Public Welfare a higher amount than he customarily charged those who were not welfare patients.

The facts clearly disclose that plaintiff used two fee schedules during all of the periods in question. One fee schedule was used when payment was made on an immediate basis. Immediate basis was defined as payment by cash, check or Bankamericard or Master Charge. A second fee schedule was used when there was a deferred fee. This fee schedule was used when there was a third-party payment, which was predominantly a payment to be made by the Ohio Department of Public Welfare and only occasionally to be made by an insurance company.

During the years in question, plaintiff's clients were predominantly welfare patients for whom payments were made by the Ohio Department of Public Welfare. During 1968, from ninety to ninety-five per cent of his patients were welfare patients. In 1969, more than eighty per cent were welfare patients, and from 1970 through 1973 more than fifty per cent of appellee's patients were welfare patients. Of the remaining patients, throughout these years, most were immediate-payment basis patients, as only occasionally was there a third-party insurance company involved.

An examination of the fee schedules shows that there was a very substantial difference between the amount of fees charged immediate-payment patients, as opposed to deferred-payment patients. For example, for certain x-rays, the charge for immediate pay was $5 as opposed to $30 for deferred payment; an increase of six times. An initial oral examination for immediate payments was $8 and for deferred payment, $20. For full upper dentures, the immediate payment cost was $100 as opposed to $235 for deferred payment. In examining the fee schedule, the charges are greatly increased for deferred pay, sometimes as much as six times that charged on an immediate-pay basis.

Dr. Riviere testified that it was more expensive to do business on a deferred basis, but presented no statistical justification; instead, he stated that the cost for deferred-payment patients ranges from two and one-half times to six times higher, as in the indicated examples. He stated that this was so: "simply because I must have arbitrarily decided it to be that way." In another example, he was asked if there was any reason why the fee ought to be twice as high, and he stated: "None, other than the fact that I elected to make it twice, sir." Later on, Dr. Riviere was asked why he had two fee schedules and chose to charge people that pay cash less. The answer was as follows:

"I had indicated that there was one reason and it cost me more money to do business with a deferred patient.

I have other reasons, and the second reason is that I am interested in stimulating the immediate pay practice. I am trying to increase and stimulate that part of my business and I have done precisely that. As a result of this, that part of my practice is growing and growing quite large."

The legal issue involved in determining whether plaintiff was restricted to charging the Ohio Department of Welfare the fees that he charged his immediate-pay patients was whether in determining the customary charges his welfare patients could be included. If that is the case, plaintiff did not overcharge the Ohio Department of Public Welfare as it is conceded that even the higher deferred-patient charges of plaintiff were lower than the prevailing charges in Columbus for similar services.

As previously stated, the regulation defines customary charges as the amount charged in the majority of cases for a similar medical procedure or service. Plaintiff argues, and the trial court so found, that welfare patients could be included in determining what is charged in the majority of cases. Since at all times a majority of plaintiff's patients were welfare patients, those charges would control if that interpretation is applied.

Defendants contend that welfare patients may not be included in determining customary charges and that under federal regulations plaintiff is restricted to the customary charges made to the majority of his *other* patients—*i. e.*, the immediate-payment patients, and that he must refund the excess amount paid him based on his much higher deferred-fee schedule.

This court feels that the trial court erroneously interpreted the federal regulations in determining the calculation of plaintiff's customary charge. When the regulations were instituted, they were obviously intended to apply to dentists carrying on a private practice who wished to also service welfare patients. The reason for determining customary charges was to determine what to charge welfare patients. The proper method for determining the customary charge is to determine what was charged a majority

of the time for each service performed for a dentist's private patients. In order to prevent a dentist who was doing charity work or work at lower than usual charges for welfare patients from being hurt by the regulation, the regulation, 20 C. F. R., Section 405.503(A), also provides that:

"Token charges for charity patients and substandard charges for welfare patients and other low income patients are to be excluded."

That provision should not be construed to mean that you can include welfare patients if the dentist charges more to them. If the regulation is interpreted to permit inclusion of welfare patients, when a provider reaches the point where he is doing a greater amount of welfare work than private work, as in plaintiff's case, he can charge any fee up to the allowable state maximum to the welfare patients, as it would be the fee charged the majority of the patients. By so doing, the provider's private practice could be subsidized and built up at the expense of the taxpayer, as was candidly conceded to be done in this case.

Thus, you must look at the fees charged the majority of the provider's patients, excepting welfare patients or charity patients, to determine the customary charge. In plaintiff's case, the majority of those patients are the immediate-pay patients who are charged under the lower fee schedule.

Defendants' first assignment of error is sustained and the issues of the counterclaim are remanded to the trial court to determine the amount of damages applicable.

The second assignment of error is that the trial court erred in issuing injunctive relief against defendants to force the payment of state moneys that the auditor was holding as a set-off against the counterclaim, in the event defendants prevailed on the counterclaim.

We need not decide whether the trial court may hypothetically order injunctive relief prior to the determination of a counterclaim in which a set-off might be applicable, as Civ. R. 54 prevented the trial court's judgment on the first claim from becoming a final judgment at any time before the entry of judgment adjudicating all of the claims and

the rights and liabilities of all of the parties, including the counterclaim. There was no express determination to the contrary, indicating no just reason for delay, as required by Civ. R. 54 (B), that would alter the usual finality of a partial judgment. Hence, defendants were not prejudiced by the trial court's determination. Moreover, the state of Ohio has issued all moneys to plaintiff which were due him on plaintiff's claim, which renders the issue moot. See *Mid-America Telephone Co.* v. *Public Utilities Comm.* (1962), 173 Ohio St. 333. Assignment of error two is overruled.

The third assignment of error is that the trial court erred in holding that it had jurisdiction to entertain plaintiff's complaint. As we previously held in the prohibition case in this very action, the Court of Common Pleas had jurisdiction over the issues herein, except as prohibited by the limited writ of prohibition. See *State, ex rel. Ferguson,* v. *Shoemaker,* unreported, Franklin County Court of Appeals No. 75AP-194. Assignment of error three is overruled.

Assignment of error one is sustained and assignments of error two and three are overruled. The judgment of the trial court is reversed and the case is remanded to the trial court for further proceedings consistent with this decision.

*Judgment reversed.*

HOLMES and REILLY, JJ., concur.