[No. B059056. Second Dist., Div. Seven. May 20, 1992.]

PHYSICIANS AND SURGEONS LABORATORIES, INC., Plaintiff and Respondent, v.
DEPARTMENT OF HEALTH SERVICES, Defendant and Appellant.

970

**COUNSEL**

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Charlton G. Holland III, Assistant Attorney General, John H. Sanders and Richard T. Waldow, Deputy Attorneys General, for Defendant and Appellant.

Hooper, Lundy & Bookman and Patric Hooper for Plaintiff and Respondent.

**OPINION**

**WOODS (Fred), J.**—The Department of Health Services (Department) appeals from a final judgment granting a petition for a peremptory writ of mandate ordering the Department to set aside an administrative decision. Respondent is an independent clinical laboratory (lab) which provides clinical testing services on behalf of physicians and clinics and is also a provider

under the state's Medi-Cal program. Two of respondent's facilities were audited by the Department, which found that respondent was in violation of a regulation prohibiting discriminatory billing, such as respondent's dual pricing schedule. The trial court ordered that the administrative decision upholding the regulation be set aside.

The issue presented by this appeal is whether or not the Department had the authority to enact such a regulation and, if so, whether the Department's interpretation and application of the regulation were arbitrary and capricious. We conclude that the regulation was valid and that the Department's interpretation and application were reasonable and not arbitrary and capricious. Accordingly, we reverse the trial court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I. *Overview*

The Medicaid program is the federal/state health care program for the poor. (42 U.S.C. § 1396 et seq.) California's Medicaid program is known as Medi-Cal. (Welf. & Inst. Code,[1] § 14063; Cal. Code Regs.,[2] tit. 22, § 50000 et seq.) Medi-Cal is administered at the state level by the Department. Among the health care benefits available to Medi-Cal beneficiaries are outpatient laboratory services. (§ 14132, subd. (f).)

Laboratory services may be provided in physician offices, hospitals and independent clinical laboratories, such as the two facilities in question owned by respondent.

II. *Proceedings Below*

A. *The Administrative Proceedings*

1. *The Audits*

Pursuant to sections 14133 and 14170, the Department audits claims submitted by Medi-Cal providers. The provider is entitled to a formal administrative hearing on any disputed overpayment. (§ 14171; Reg. 51017.)

In May and November 1988, an audit team conducted onsite reviews of respondent's Medi-Cal practice by examining the records of its Huntington

---

[1]Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.
[2]Hereafter, all regulation references are to title 22 of the California Code of Regulations.

Beach and Los Angeles facilities. The reviews concerned services rendered from May 1986 through October 1987 and March 1987 through October 1987, respectively.

The audits identified numerous problems. However, the central finding was that respondent violated Medi-Cal regulations by billing Medi-Cal substantially more for tests than it charged physician and physician clinics (provider-type clients) for the same services rendered to non-Medi-Cal patients. Only that finding is involved in this appeal.

On June 30, 1989, the Department issued its audit report, concluding that respondent had been overpaid. The amount of the overpayment was determined to be $486,226. Respondent timely appealed the audit results.

### 2. The Issue Presented at the Administrative Hearing

The parties framed the issue as:

"Whether the Department acted correctly when it reduced the Medi-Cal amounts to be paid to [respondent] to the amount [respondent] charged its physician and physician clinic clients for panel/profile tests (Reason Code/adjustment no. 65) and individual laboratory tests (Reason Code/adjustment no. 66)."[3]

The parties stipulated that the claims submitted for patients RM and LR would be deemed to be representative of the entire audit disallowance under reason codes 65 and 66, respectively.

### 3. Testimony at the Administrative Hearing

#### a. Fan Yee

The parties stipulated that Yee was an expert witness in the area of statistics, and further stipulated as to the methodology of the statistical sampling the Department used in the audit. The parties stipulated that the Department had met its burden of proof with respect to the statistical sampling.[4] Therefore, Yee's testimony consisted almost entirely of cross-examination. He testified as to how the final overpayment amount was extrapolated from the claims sampled.

---

[3] A reason code is a code number assigned to all audit adjustments which were made for the same reason.

[4] The burden of proof at such a hearing requires the Department to first prove the validity of its audit adjustments by a preponderance of the evidence. If it does so, the burden then shifts

### b. *Alvin Eckert*

Eckert is a staff analyst who participated in the audit of respondent's facilities. He testified as to the audit methods used and the reason for finding that overpayments had been made.

Labs are selected for audit by a computerized system which identifies labs with a high incidence of Medi-Cal billing problems. At the onsite audit, respondent was asked to provide the auditors with its fee schedules, but respondent failed to provide the schedules until after two letters requesting them were subsequently sent to it. Respondent's fee schedule reflected a set of fees charged to provider-type clients for tests performed on non-Medi-Cal patients which were lower than the fees charged to Medi-Cal for identical tests.

On the claims for patient RM, respondent had billed Medi-Cal $151.45 (Medi-Cal paid $120.40) for a custom panel test. Respondent's fee schedule showed that it charged only $25 to provider-type clients to perform such a test on their non-Medi-Cal patients.

For patient LR, respondent billed Medi-Cal $10.90 (and Medi-Cal paid $7.60) for an individual complete blood count. However, respondent's fee schedule showed that it charged provider-type clients only $3.95 to perform the same test on non-Medi-Cal patients.

The Department based its audit adjustments on regulations 51501 and 51458.1. Reason codes 65 and 66 relate to regulation 51501. The auditors computed the amount of overpayment on each of the sample claims chosen at random at respondent's two facilities. Yee then extrapolated a total overpayment amount based on the samples. In performing audits, pursuant to regulation 51502, subdivision (b), Eckert disallowed any additional increment of cost billed to Medi-Cal by a lab to cover costs associated with processing the billing of Medi-Cal.

Tape-to-tape billing, i.e., submission of bills via magnetic tape, thereby eliminating the need for hard-copy bills, has greatly decreased labs' expense in billing Medi-Cal.

### c. *Al Teplow*

Teplow is a Department lab examiner who analyzes whether providers are complying with Department regulations. He qualified as an expert witness in

---

to the Medi-Cal provider to prove, by a preponderance of the evidence, that the adjustment is incorrect. (Reg. 51037, subd. (i).)

lab management and testified as to the broader picture of lab management and billing practices and trends.

Medi-Cal payments to labs have grown enormously in number in recent years. Because of automation of testing, there is no future for the small lab, and the market has become dominated by a few, increasingly larger, labs. In order to compete in such a tight market, labs employ sales forces to approach potential customers, including physicians, and offer reduced fees, including loss leaders.

Although volume dictates price, in 50 years, Teplow had not heard of a salesman offering Medi-Cal a discount even though it is a large volume customer. In Teplow's opinion, taxpayers subsidize the discounts given to other customers.

### d. *Stanley Ordway*

The only witness called by respondent was Ordway, its president. Labs provide, among other services, diagnostic testing of human blood, urine and tissue specimens. With certain rare exceptions, testing may not be undertaken by a lab unless a physician orders the tests. Individual tests or groups of tests, known as panels or profiles, may be ordered and performed. Lab services consist of three components: (1) drawing and collection of the specimens, (2) the performance of the tests, and (3) the administrative and billing function.

According to respondent, labs receive payment for their services from a variety of sources, and, in a majority of cases, the labs directly bill third party payors, such as Medi-Cal, or private patients. However, in some cases, the labs bill the ordering provider-type client. In such cases, labs are able to provide wholesale or discounted prices to their provider-type clients. The reason why provider-type clients are charged less for non-Medi-Cal patients' tests is "the amount of time and expense involved in the billing process . . . Medi-Cal just takes a tremendous amount of time."

Charges to provider-type clients for non-Medi-Cal patients' tests may be billed with ledger billing, whereby a single bill may be submitted monthly for all of the tests performed for all of the provider-type client's patients, and the provider bills the patient. The risks of billing and collection for the tests are thus shifted to the provider-type client.

Billing Medi-Cal is more cumbersome. Medi-Cal requires billing for individual patients and individual tests. Duplicate bills must be submitted in

many cases. Delay in Medi-Cal payments are common. Compliance with Medi-Cal billing requirements takes two and one-half full-time employees to perform the administrative and billing component, as opposed to one full-time employee to perform the same task for Medicare.

Labs have two fee schedules. Like most labs in the country, respondent charges its provider-type clients a lower price than it charges its third party payors and walk-in private patients.

Although respondent switched to tape-to-tape billing, he was not certain when that occurred, but thought that it was after the date the services in question were rendered. The switch has not reduced the number of persons hired to perform Medi-Cal billing. In Ordway's opinion, the services performed for Medi-Cal are not comparable to those performed for non-Medi-Cal patients because of the added billing work.

For respondent's 1987 billings, tests for provider-type clients patients, comprised 34 percent at the Huntington Beach facility and 18 percent at the Los Angeles facility; without Medi-Cal, the billings were between 41 and 42 percent at both locations.

Ordway admitted knowing that labs are prohibited by Medi-Cal regulations from charging an additional amount to cover billing/administrative costs. Although he testified that respondent charges the same price for tests regardless of patient, when confronted with respondent's fee schedule listing two prices for the same panel, he admitted that different prices are charged to Medi-Cal.

Ordway admitted that respondent does not perform a panel test any differently for a Medi-Cal patient than it does for a private patient. Finally, looking at the prices charged for one particular panel, he admitted that he had no evidence or indication that the $150 difference between what respondent charged Medi-Cal for such a panel and what it charged a private physician, was actually worth that amount.

Ordway conceded that respondent's participation as a Medi-Cal provider is voluntary and that, in becoming a provider, one agrees in writing to abide by the Medi-Cal regulations.

Ordway further admitted that he had no studies with him to substantiate his claim that the cost of services performed for Medi-Cal patients was more costly than the cost of services performed for private physicians and that respondent has no single physician customer who buys the same volume of

services from it as Medi-Cal does. He also admitted that although tape-to-tape billing is less labor-intensive than the old method of billing, respondent has not reduced its charges to Medi-Cal as a result.

### 4. *Administrative Decision*

On December 5, 1989, a hearing on the appeal was held before an administrative law judge (ALJ). On April 16, 1990, the ALJ issued his proposed decision, basically denying the audit appeal. On April 28, 1990, the Chief Deputy Director of the Department adopted the proposed decision as the final decision.

### B. *Trial Court Proceedings*

As authorized by section 14171, subdivision (k), pursuant to Code of Civil Procedure section 1094.5, respondent filed a timely petition for a peremptory writ of mandate for judicial review of Medi-Cal's audit decision. The petition alleged that the audit decision was "[b]ased on an unauthorized and wholly arbitrary and capricious interpretation of its regulations."

The court held an initial hearing on the petition on January 14, 1991. Since the court felt that a point raised for the first time in respondent's reply brief might be determinative, it granted the parties the opportunity to submit supplemental briefs and continued the hearing. After the second hearing, the court took the matter under submission.

On March 14, 1991, the court issued a statement of decision by way of a minute order and granted the petition. The court found that: (1) "the amount charged to Medi-Cal is lower than that charged to the general public," and (2) "the petitioner's charges to those certain physicians and clin[ic]s are not those charged to the general public."

Respondent prepared a notice of ruling and a proposed judgment.

The Department lodged a counter proposed judgment and a notice and request pursuant to Code of Civil Procedure section 634 to resolve ambiguities in the court's statement of decision. The request set forth the many material controverted issues which had not been resolved or addressed in the statement of decision and sought clarification of the ambiguities contained in the statement.

The court summarily signed and entered the judgment submitted by respondent. Notice of entry of judgment was served on April 8, 1991, and the Department filed a timely notice of appeal.

## ISSUES ON APPEAL

Respondent attacks the administrative decision upholding the Department's audit adjustments on the basis that: (1) The Department had no statutory authority to limit Medi-Cal payment to a lab's lowest price, and (2) even if it did, the regulations were applied and interpreted in an arbitrary and capricious manner and/or were procedurally invalid.

## DISCUSSION

## THE ADMINISTRATIVE DECISION

The administrative decision held that:

1. The Department's policies regarding discriminatory billing and the collection of overpayments are authorized by statute. Respondent admitted that it engaged in discriminatory billing in that it charged Medi-Cal more than it charged its provider-type clients for the same lab services.

2. Respondent is not entitled to charge Medi-Cal more than it charges its provider-type clients for the same services as a means of covering allegedly higher costs incurred in billing Medi-Cal. Such a practice is explicitly prohibited by regulation 51502, subdivision (b).

3. The Department's interpretation of regulation 51501 is not arbitrary, capricious or incorrect; that issue had been resolved in the Department's favor in numerous prior administrative appeals.

4. The applicable regulations were duly adopted under the California Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.), and the Department is free to interpret them as it sees fit, so long as it does so within legal confines. Its interpretation in this case was reasonable.

5. The Department has the regulatory authority to employ statistical sampling as an auditing technique. However, the overpayment should be adjusted to account for the precision level of the statistical extrapolation.[5]

---

[5] In respondent's writ petition, it also challenged the statistical sampling and extrapolation methods used by the Department. The court does not appear to have ruled on that challenge. Although the Department contended on appeal that such methods were proper, respondent did not argue to the contrary on appeal. Thus, we deem any issue as to the use of those methods to have been waived by respondent. (Cf. *Humes* v. *MarGil Ventures, Inc.* (1985) 174 Cal.App.3d 486, 493 [220 Cal.Rptr. 186].)

## Relevant Regulations

The following regulations deal with excessive charges to Medi-Cal:

A. In pertinent part, regulation 51501 provides:

"(a) Notwithstanding any other provisions of these regulations, no provider shall charge for any service or any article more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances."

B. Regulation 51502, subdivision (b) provides:

"Notwithstanding any other provisions of these regulations, payment for any service rendered includes the payment for completion of the required authorization or billing forms. No provider shall submit charges or receive additional payment for the completion of required authorization or billing forms."

C. Regulation 51529, subdivision (a)(2) provides:

"Reimbursement for laboratory tests shall be the least of the following: [¶] (A) The amount billed. [¶] (B) The charge to the general public. [¶] (C) Medicare's maximum allowance. [¶] (D) The maximum allowance allowed by (b) or (c) [the maximum allowances established by the Department for individual and panel tests]."

D. Regulation 51480, subdivision (a) provides:

"No provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service."

E. In pertinent part, regulation 51458.1, subdivision (a) provides:

"(a) The Department shall recover overpayments to providers including, but not limited to, payments determined to be:

". . . . . . . . . . . . . . . . . . . . . . .

"(2) In excess of the amounts usually charged by a provider."

## STANDARD OF REVIEW

At the outset, we must acknowledge that the basis for the trial's court's ruling is not clear. When the court granted the petition for a writ of mandate, it made what appears to be either two factual findings or two mixed findings. Respondent suggests that since it was challenging the administrative decision's conclusions of law, the court's findings are interpretations of the relevant regulations, i.e., they are conclusions of law.

"The posture of a case in which the sufficiency of the evidence is not disputed is identical to that where the facts before the administrative agency are uncontradicted. In such a case the only issue concerns the conclusions to be drawn from the pertinent facts; the trial court's determination is therefore a question of law. [Citation.] On appeal our review is not circumscribed by the substantial evidence rule, but amounts to an inquiry of law. In essence we treat the appeal as a renewed petition for a writ of mandate." (*Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1311 [237 Cal.Rptr. 884].)

As respondent concedes that it charged Medi-Cal more than it charged its provider-type clients, we will treat this appeal as a renewed petition for a writ of mandate. Furthermore, "[w]here, as here, the facts are undisputed and the case concerns the proper application of a statute or administrative regulation, an appellate court is not bound by the trial court's determination." (*Will* v. *Kizer* (1989) 208 Cal.App.3d 709, 715 [256 Cal.Rptr. 328].)

Accordingly, we need not be concerned with the basis for the trial court's decision.[6]

## ANALYSIS OF THE ISSUES

### I. *Appellate Review of Agency Regulations*

The Department is authorized to adopt rules and regulations to carry out the purposes and intent of Medi-Cal. (§ 14124.5.) The purpose of Medi-Cal "is to afford to qualifying individuals health care and related remedial or preventive services, . . ." (§ 14000.) "The means employed shall be such as to allow, to the extent practicable, eligible persons to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability." (Former § 14000, subd. (a.).)

---

[6]Thus, we need not address the Department's contention that reversal is necessary because of the court's failure to resolve controverted issues in its statement of decision.

"It is the function of the Legislature to declare a policy and fix the primary standard. To promote the purposes of the legislation and carry it into effect, the authorized administrative or ministerial officer may 'fill up the details' by prescribing administrative rules and regulations." (*Knudsen Creamery Co. v. Brock* (1951) 37 Cal.2d 485, 492 [234 P.2d 26].) In order for a regulation to be valid, it must be (1) consistent with and not in conflict with the enabling statute and (2) reasonably necessary to effectuate the purpose of the statute. (Gov. Code, § 11342.2.)

■ In other words, the rulemaking authority of an agency is circumscribed by the substantive provisions of the law governing the agency. (*Henning* v. *Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 757 [268 Cal.Rptr. 476].) Thus, the first task of the reviewing court is to decide that the agency reasonably interpreted its legislative mandate as regulations that alter or amend the statute or enlarge or impair its scope are void. (*Id.*, at pp. 757-758.) This standard of review is one of respectful nondeference. (*Id.*, at p. 758.)

■ " 'Where the language of the governing statute is intelligible to judges their task is simply to apply it, whether that be language of substantive limitation or the boundaries of a delegation of rulemaking authority. Where the intelligibility of the statutory language depends upon the employment of administrative expertise, which it is the purpose of the statutory scheme to invoke, the judicial role "is limited to determining whether the [agency] has reasonably interpreted the power which the Legislature granted it." ' " (219 Cal.App.3d at pp. 758-759.)

■ Second, when looking at the standard of reasonable necessity, judicial review is limited to a determination " 'whether the agency's action is arbitrary, capricious, lacking in evidentiary support, or contrary to procedures provided by law.' " (219 Cal.App.3d at p. 758.)

II. *The Department Was Authorized to Limit Medi-Cal Payment to a Lab's Usual Charge.*

A. *Regulation 51501 Is a Reasonable Interpretation of the Enabling Statutes.*

The administrative decision relied on regulations 51501 (prohibiting discriminatory billing by providing that the charge to Medi-Cal shall be the same as to "other purchasers of comparable services") and 51458.1 (providing for the recovery of overpayments due to charges in excess of the amounts usually charged) to uphold the audit adjustments.

Respondent contends that the first issue to be addressed by this court is whether or not the Department's actions were statutorily authorized. ■ Whether the regulations promulgated by the Department were statutorily authorized is a legal question. (*Transcentury Properties, Inc.* v. *State of California* (1974) 41 Cal.App.3d 835, 842 [116 Cal.Rptr. 487].)

"The regulation comes before the court shielded by a presumption of regularity; focus of judicial inquiry is whether the regulation would alter or amend the statute or enlarge or restrict the agency's statutory powers." (*Schenley Affiliated Brands Corp.* v. *Kirby* (1971) 21 Cal.App.3d 177, 182 [98 Cal.Rptr. 609].)

This issue of the statutory authority for the Department's actions was addressed by the ALJ. Since we agree with his reasoning, we quote it hereafter.

■ "A review of federal and state law authorizes the Department not only to preclude the activity of discriminatory billing in which [respondent is] engaged, but allows the Department to collect any overpayment which may arise therefrom. [Regs. 51480 & 51458.1.]

"Title XIX of the Social Security Act [42 U.S.C. § 1396 et seq.] provides for the establishment of cooperative federal-state Medicaid programs to pay for necessary medical services rendered to certain needy individuals whose income and resources are insufficient to pay for the services. [42 U.S.C. § 1396.] No state is required to institute a Medicaid program, but if a state chooses to do so, it must submit to the Secretary of Health and Human Services a satisfactory 'state plan' that fulfills all requirements of the Act. [42 U.S.C. § 1396a(a).]

". . . . . . . . . . . . . . . . . . . . . . . . .

"The state plan must also provide for payment of services provided under the plan pursuant to the standard set forth in [42 U.S.C. § 1396a(a)(30)(A).] The state plan must also provide for utilization controls on the services 'to safeguard against unnecessary utilization of such care and services and to assure that payments are *consistent with efficiency, economy, and quality of care*.' [42 U.S.C. § 1396a(a)(30)(A).] Furthermore, the state plan must provide for such audits as the Secretary determines are necessary to [insure] that proper payments are made. [42 U.S.C. § 1396a(a)(42).] The Secretary requires periodic audits. [42 C.F.R. § 447.253 (e).]

"California has implemented these requirements by authorizing the Department to adopt regulations imposing utilization controls on providers.

[§§ 14109, 14133, 14133.1 & 14170.] The Department authorized postservice, postpayment audits by adopting [regulation 51159, subdivision (c)].

"The relationship between the Department and Medi-Cal providers is contractual. [*California Medical Assn.* v. *Lackner* (1981) 117 Cal.App.3d 552, 561.] . . . Therefore, providers are subject to the statutory and regulatory conditions of the Medi-Cal program." (Italics added.)

In *California Ass'n of Bioanalysts* v. *Rank* (C.D.Cal. 1983) 577 F.Supp. 1342, the district court addressed the issue of whether or not a bill providing for an overall average 25 percent reduction in the state's Medi-Cal reimbursement rates for lab services was valid. In upholding the reduction, the court noted that: "Prior to July 1, 1982, . . . federal agencies repeatedly had criticized Medi-Cal reimbursement rates for laboratory and pathology services as excessive, and had recommended that DHS reduce these rates. The Department of Finance of the State of California, moreover, had conducted a survey which indicated that 53% of the providers of laboratory and pathology services in California . . . employed dual price practices, billing Medi-Cal at rates approximately 34% higher than those charged physicians for identical services." (*Id.*, at p. 1345.)

The court also noted that in 1978, the United States Department of Health, Education and Welfare (DHEW) and the Department had jointly reviewed Medi-Cal reimbursement rates and found California was paying too much for lab services in that the maximum amounts allowed by Medi-Cal were 20 to 254 percent greater that the prices quoted to physicians, the practice of labs charging Medi-Cal more than physicians for the same service was the rule rather than the exception, and physicians were charged less because they were in a competitive environment where the fees were primarily based on the going rate in the market place. (577 F.Supp. at p. 1353.)

DHEW concluded that there was a significant potential for realizing program savings in Medi-Cal lab services and recommended that the Department "increase audit and surveillance activities to reduce the incidence of dual pricing, and reduce the maximum reimbursements for laboratories to reflect the prevailing rates for physicians." (577 F.Supp. at p. 1353) DHEW recommended that the state adjust the maximum allowances to reflect rates available to physicians from independent labs. (*Ibid.*, fn. 21.)

Furthermore, "[t]he director shall prescribe the policies to be followed in the administration of this chapter, may limit the rates of payment for health care services, and shall adopt such rules and regulations as are necessary for carrying out, not inconsistent with, the provisions thereof." (§ 14105, subd. (a).)

Given the federal and state concerns with dual pricing and the Department's obligation to see that Medi-Cal is managed economically as well as its statutory authority to limit rates, we conclude that the Department's enactment of regulation 51501 was a reasonable interpretation of the federal and state enabling statutes which in turn constitute the statutory foundation for the regulation. (*Schenley Affiliated Brands Corp.* v. *Kirby, supra,* 21 Cal.App.3d 177, 190.)

Respondent attacks regulation 50501 on the basis that: (1) the Department was trying to get the most favored rate which had been negotiated with its provider-type clients without negotiating a contract with respondent pursuant to section 14105.3, subdivisions (c) and (d);[7] and (2) while the Department has the authority to set statewide rates, the Department failed to follow the rate making procedure when it enacted a regulation limiting the rate.

B. *Section 14105.3 Does Not Preempt Regulation 51501.*

█ Respondent argues that the Department is attempting to obtain lower prices without the burden of negotiations and without providing the administrative convenience that its provider-type clients can because the Department requires separate billing and separate eligibility statements.

Respondent is comparing apples and oranges. Section 14105, subdivision (b) gives the director authority to limit rates of payment and regulation 51501 limits the rate of payment to the price charged to other purchasers of comparable services. Section 14105.3, which permits the Department to negotiate contracts in order to obtain most favorable prices, allows the Department to enter into exclusive contracts with a lab if it can demonstrate the cost effectiveness of the contract. Both provisions are means by which the Department can lower Medi-Cal costs.

Regulation 51501, which was enacted in 1967 (Cal. Admin. Notice Register, tit. 22, Register 67, No. 23 (June 10, 1967)), predates section 14105.3, which was enacted in 1971. (Stats. 1971, ch. 577, § 31.2.) Nothing in section 14105.3 indicates that it is the exclusive means for striking at inflated bills. To argue that section 14105.3 is the only means to lower the rates paid to

---

[7] In relevant part, section 14105.3 provides: "(c) The department is hereby specifically authorized to contract with . . . supplier of outpatient clinical laboratory services on a bid or nonbid basis. . . . Nothing in this section shall be construed as prohibiting the department from contracting with less than all manufacturers or clinical laboratories including just one manufacturer or clinical laboratory, on a bid or nonbid basis. [¶] (d) Prior to entering into any contract under this section, the department shall submit a report to the Legislature demonstrating the cost-effectiveness of the contract."

labs is like arguing that the other regulations were repealed or preempted by it. As the law disfavors repeal by implication (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449]), we conclude that section 14105.3 does not repeal or preempt regulation 51501, but instead is a different means of accomplishing the same goal of cost effective lab services.

### C. *The Department Did Not Need to Follow the Ratemaking Procedure in Enacting Regulation 51501.*

■ Citing *California Ass'n of Bioanalysts* v. *Rank, supra*, 577 F.Supp. 1342, respondent's second argument is that the Department did not follow the ratemaking procedure when it enacted regulation 51501. The court there noted that DHEW recommended that in order to reduce costs, not only should California reduce the maximum reimbursement for lab services, but also increase audits to reduce the incidence of dual pricing. (At p. 1353.) As can be seen from *California Ass'n*, the ratemaking procedures are used to set rates pursuant to one of the four categories for reimbursement listed in regulation 51529, subdivision (a)(2). The ratemaking procedure is applicable to regulation 51529, subdivision (a)(2), subsection (D)—the maximum allowances established by the Department for individual and panel tests. Accordingly, it was not necessary for the Department to follow the ratemaking procedure when it was acting pursuant to another regulation which, by its own terms, applied notwithstanding any of other provisions of the regulations. The two regulations are alternative means of lowering costs.

Respondent further argues that the Department is attempting to impose a retroactive rate materially lower than the statewide rate without its agreement. However, respondent admits that it agreed to abide by the regulations, and regulation 51501 prohibits discriminatory billing. Although it is not clear when respondent became a Medi-Cal provider, since regulation 51501 was added in 1967 and the audits in question here were for rates charged in 1986 and 1987, imposing a rate under the auspices of regulation 51501 cannot be considered imposing a retroactive rate.

### III. *The Relevant Regulations Were Properly Interpreted and Applied.*

■ "The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law, and while an administrative agency's interpretation of its own regulation obviously deserves great weight, the ultimate resolution of such legal questions rests with the courts." (Citations omitted.) (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161].) However, the court generally will not depart from the agency's interpretation unless it is clearly erroneous or

unauthorized. (*Grier* v. *Kizer* (1990) 219 Cal.App.3d 422, 434 [268 Cal.Rptr. 244].)

### A. *Interpretation of Regulation 51501*

Regulation 51501 prohibits charging Medi-Cal more that "would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances." Respondent's claimed basis for the different prices charged to Medi-Cal is the greater billing and administrative costs and the fact that the Department cannot offer economies of scale. Respondent contends that it is this difference which makes regulation 51501 inapplicable because Medi-Cal's billing requirements makes the services dissimilar and the circumstances noncomparable.

Ordway, respondent's expert, did not testify that all of its provider-type clients accepted ledger-type billing. Ordway admitted that he had no studies with him to substantiate his claim that the cost of services performed for Medi-Cal patients was more costly than the cost of services performed for private physicians.

As reflected in the stipulated sample for patient RM, on one test, Medi-Cal was charged $151.45 while the provider-type clients were charged $25. Ordway admitted that for another test, the fee schedule showed that there was a $150 difference between what was charged to provider-type clients and what was charged to Medi-Cal. Ordway even admitted that he had no evidence or indication that this $150 difference was actually worth that amount. We conclude it is unlikely that such differences are due to billing costs. Thus, respondent failed to establish that the difference in prices charged Medi-Cal was in fact based on billing costs.

Without evidence supporting the price difference being due to the cost of billing, we must agree with Teplow's observation that the taxpayers are subsidizing the discounts given to respondent's provider-type clients. As observed in *California Ass'n*, "such added expenses could not possibly serve as a valid rationale for the wide disparity in prices charged." (*California Ass'n of Bioanalysts* v. *Rank, supra,* 577 F.Supp. 1342, 1356, fn. 24.)

Moreover, regulation 51502, subdivision (b) essentially prohibits the payment of an additional amount for billing costs. Respondent attempts to get around this regulation by claiming that it charges Medi-Cal a retail rate and then, by giving a discount for allegedly lower billing costs, charges its provider-type clients a wholesale rate. The result is still to charge Medi-Cal

an additional amount for billing. Furthermore, it has been observed that: "On numerous occasions, however, both federal and state bodies had concluded that there was only a slight cost-justification, if any, for dual pricing." (*California Ass'n of Bioanalysts* v. *Rank*, *supra*, 577 F.Supp. 1342, 1356, fn. 24.)

Accordingly, we conclude that since respondent performed comparable services in comparable circumstances for both Medi-Cal and its provider-type clients, regulation 51501 prohibits the use of respondent's dual pricing schedule.

The court's findings that the amount charged to Medi-Cal is lower than the charges to the general public and that the charges to the provider-type clients were not charges to the general public, suggests that the court looked to regulations 51529 and 51480 when it granted the writ petition.

B. *Interpretation of Regulations 51529, 51480 and 51458.1*

Regulation 51529 limits the maximum reimbursement for lab services to either the amount billed, the charge to the general public, Medicaid's maximum or the Department's maximum allowances for certain tests. Regulation 51480 prohibits charging an amount higher than that usual fee charged to the general public. ██ Respondent argues that its provider-type clients are not included in the definition of general public.

There is some ambiguity in the terminology of these regulations. Regulation 51501 refers to "other purchasers" while regulations 51529 and 51480 refer to the "general public." As already noted, regulation 51501 was added in 1967. Regulations 51529 and 51480 were added in 1971 and 1970 respectively. (Cal. Admin. Notice Register, title 22, Register 71, No. 40 (Oct. 2, 1971) and history note reg. 51480.)

First, by its own terms, regulation 51501 applies notwithstanding the other provisions. Second, these regulations should be interpreted so that any inconsistencies in them are harmonized. (Cf. *Piazza Properties, Ltd.* v. *Department of Motor Vehicles* (1977) 71 Cal.App.3d 622, 633 [138 Cal.Rptr. 357].) The regulations should also be read in light of the objective sought to be achieved by them. (Cf. *People* v. *Carroll* (1970) 1 Cal.3d 581, 584 [83 Cal.Rptr. 176, 463 P.2d 400].) One of the implied goals of the regulations is to secure the lowest price for lab services in order to economically allocate scarce public funds. (See *Griffith* v. *Gibson* (1977) 73 Cal.App.3d 465, 469-470 [142 Cal.Rptr. 176].)

In construing these regulations, the ALJ determined that the regulations 51529 and 51480 were a restatement of regulation 51501 rather than a

further restriction on it. In reaching that decision, ALJ relied on previous administrative decisions in which "other providers" and "the general public" were found to be equivalent terms and to include provider-type clients. Part of the reasoning of those decisions was the provision for comparable circumstances in regulation 51501—a provision not found in regulations 51529 and 51480, and the fact that a provider could avoid the purpose of the regulation by classifying its potential customers according to their particular attributes. We cannot say that the Department's interpretation is unreasonable, and thus it is not clearly erroneous.

Regulation 51458.1 authorizes recovery of payments in excess of the amounts usually charged. Respondent argues that the charges to its provider-type clients are not amounts usually charged, "usual charge" means the amount charged in the majority of instances, i.e, the charges to Medi-Cal, and the charges to its provider-type clients were exceptions to respondent's usual charge. Respondent's interpretation was rejected under federal law. (*Riviere, D. D. S., Inc.* v. *State* (1976) 49 Ohio App.2d 38 [2 Ohio Op.3d 120, 358 N.E.2d 1384, 1388].) Thus, "usual" charge includes charges to provider-type clients.

### C. *Application of the Regulations*

■ Respondent argues that the regulations were arbitrarily applied because of ad hoc exceptions to the antidiscriminatory billing requirement and a changing definition of "usual charges," neither of which were published or otherwise made known to the industry, and because the regulations were not uniformly enforced.

One of respondents' main complaints is that Camarillo State Hospital (Camarillo) was also charged lower fees for lab services than Medi-Cal, but unlike the lower fees charged to its provider-type clients, the fees charged to Camarillo did not trigger the antidiscriminatory billing requirement.

First, those fees were charged pursuant to a negotiated contract. Second, we cannot discern what percent of respondent's business derived from Camarillo. On the other hand, although not a majority of business, a substantial proportion of respondent's business at the two audited labs (34 and 18 percent or between 41 and 42 percent when Medi-Cal is not included) was derived from its provider-type clients.

Respondent argues that it is not rational to exclude one type of provider from the definition of general public and not exclude another. However, excluding charges to Camarillo, along with charges to indigent patients and

patients who were relatives of a physician, is a reasonable interpretation as it is reasonable to assume that the charges to these three sources constituted a very small percent of respondent's billings. These exceptions are to respondent's benefit. Without the exceptions, any time respondent charged a lower fee, it would be required to charge Medi-Cal that same lower fee.

As respondent points out, regulation 51529 requires Medi-Cal to pay the lowest of four categories, including charges to the general public, but does not limit payment to that made to any member of the general public. Moreover, we conclude that such interpretations are not regulations requiring publication, notification to the industry, or compliance with the APA. The regulations themselves were passed in accordance with the APA.

Even though dual pricing was the basis for a previous 25 percent reduction in Medi-Cal reimbursement rates and for a reduction in the prices on unlisted panels, it is obvious that the problem of dual pricing still exists. Although audits do not catch all offenders, regulations need not be enforced against all offenders.

Some arguments raised by the parties have not been discussed, or not discussed in detail, in this opinion. We have read and considered all arguments raised by the parties, but have decided that certain issues did not warrant extensive discussion.

### Disposition

The judgment is reversed and the peremptory writ of mandate is vacated. The court is directed to enter a new and different judgment denying the writ petition. The Department is to recover costs on appeal.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied June 11, 1992, and respondent's petition for review by the Supreme Court was denied August 13, 1992.