[No. B113282. Second Dist., Div. Five. Dec. 11, 1998.]

THE PEOPLE, Plaintiff and Appellant, v.
DUZ-MOR DIAGNOSTIC LABORATORY, INC., et al., Defendants and
Respondents.

**COUNSEL**

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Thomas A. Temmerman, Assistant Attorney General, Ronald A. Reiter and John Dratz., Jr., Deputy Attorneys General, for Plaintiff and Appellant.

Patric Hooper for Defendants and Respondents.

**OPINION**

**ARMSTRONG, J.**—This case concerns the marketing and billing practices and procedures of clinical laboratories which perform services for Medi-Cal beneficiaries. The Attorney General, acting on behalf of the People of the State of California, appellant here, alleged that one such laboratory, Duz-Mor Diagnostic Laboratory, Inc., violated the Unfair Competition Act[1] (the Act) by charging discounted fees to certain patients, by paying commissions to an independent marketing contractor, and by "unbundling" Medi-Cal billing, so that certain tests which should have been billed together were

---

[1]Business and Professions Code section 17200 et seq.

billed separately. Appellant also alleged that the use of unbundled billing violated the False Claims Act, Government Code section 12651. The trial court found that none of the practices were unfair and that none violated any law, and thus that appellant had not proved a violation of the Act or the False Claims Act. We agree with many of the trial court's conclusions, but do find that with regard to one of the factual allegations, concerning commissions paid to an independent contractor for marketing services, appellant proved a violation of law, and thus of the Act. We therefore reverse the judgment.

Summary

■■■ Under the Act, "unfair competition" means "any unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) A business practice constitutes unfair competition if it is forbidden by any law, "be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made" (*Saunders* v. *Superior Court* (1994) 27 Cal.App.4th 832, 838-839 [33 Cal.Rptr.2d 438]) or if it is unfair, that is, if it " ' "offends an established public policy or . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." . . .' " (*Podolsky* v. *First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89], citations omitted.)

Here, appellant alleged that respondents Duz-Mor Diagnostic Laboratory, Inc., a licensed clinical laboratory, Duz-Mor owner and chief executive officer (CEO) Joe Morehead, and Duz-Mor controller Zaven Aghankani engaged in a number of unfair business practices relating to Medi-Cal. Appellant alleged that the offer of discounted prices to certain patients and the payment of commissions to an independent marketing contractor violated Welfare and Institutions Code section 14107.2, subdivision (b)[2] and Business and Professions Code section 650[3] and a number of administrative regulations, and that the use of "unbundled" billing for certain tests violated

---

[2]Because this statute is critical to our analysis, we quote the pertinent portion in full: "[a]ny person who offers or pays any remuneration, including, but not restricted to, any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind either [¶] (1) To refer any individual to a person for the furnishing or arranging for furnishing of any service or merchandise for which payment may be made, in whole or in part [by Medi-Cal]; or [¶] (2) To purchase, lease, order, or arrange for or recommend the purchasing, leasing or ordering of any goods, facility, service or merchandise for which payment may be made in whole or in part [by Medi-Cal], is punishable upon a first conviction by imprisonment in the county jail for not longer than one year or state prison, or by a fine not exceeding ten thousand dollars ($10,000), or by both the imprisonment and fine. A second or subsequent conviction shall be punishable by imprisonment in the state prison." (Welf. & Inst. Code, § 14107.2.)

[3]Business and Professions Code section 650 provides that "Except as provided in Chapter 2.3 (commencing with Section 1400) of Division 2 of the Health and Safety Code [concerning

Government Code section 12651, subdivision (a), the False Claims Act.[4] Appellant also contended that all those practices were unfair as that term is used in the Act. Appellant sought civil penalties of not less than two million dollars, restitution of sums unlawfully obtained, and injunctions.

Judgment was entered in favor of respondents after court trial. In response to a timely request by appellant, the trial court issued a statement of decision.

The statement of decision specified that the ruling was based in part on a finding that two of the above cited statutes, Welfare and Institutions Code section 14107.2 and Business and Professions Code section 650, must be construed to require a specific intent to violate the law, in order to avoid those constitutional problems which fall under the heading of "void for vagueness." In so finding, the court relied on case law interpreting the federal Medicare "anti-kickback" statute, on which Welfare and Institutions Code section 14107.2 is modeled. For reasons set forth later in this opinion, we cannot agree that the statutes can be so read.

After review of all the evidence and arguments, we find that appellant did prove a violation of the Act, since the payment of commissions to a marketing contractor violates Welfare and Institutions Code section 14107.2.

---

licensed nursing home referral agencies], the offer, delivery, receipt, or acceptance by any person licensed under this [Healing Arts] division of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any membership, proprietary interest or coownership in or with any person to whom these patients, clients, or customers are referred is unlawful. [¶] The payment or receipt of consideration for services other than the referral of patients which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished or with the fair rental value of any premises or equipment leased or provided by the recipient to the payor. [¶] . . . [¶] A violation of this section is a public offense and is punishable upon a first conviction by imprisonment in the county jail for not more than one year, or by imprisonment in the state prison, or by a fine not exceeding ten thousand dollars ($10,000), or by both such imprisonment and fine. A second or subsequent conviction is punishable by imprisonment in the state prison." The omitted portions of statute then regulate referrals by a licensed person to a health care facility in which the licensee has a propriety interest.

[4]At trial, appellant also proceeded on the theory that respondents had made cash payments to doctors for referrals. In support, appellant produced the testimony of the independent contractor, Arthur Simburg. Under a grant of immunity, Simburg testified that he had made cash payments to physicians in return for their business and that Morehead and Aghankani knew of these payments and approved the practice. Morehead and Aghankani testified to the contrary. The trial court found that Simburg's testimony in this regard was not credible and that in making cash payments Simburg exceeded any agency or authority he had on behalf of respondents, so that respondents were not responsible for any cash kickbacks paid by Simburg. That finding is not challenged on this appeal.

However, appellant did not prove that the practice of offering discounted payments to certain patients, or the "unbundled" billing, violated any law or administrative regulation, or was unfair as that term is defined in the Act.

## STANDARD OF REVIEW

■ The facts of this case are in large part undisputed, and were the subject of findings of fact by the trial court. Where appellant does challenge the sufficiency of the evidence to support a finding we are bound by the substantial evidence rule, and must accept as true all evidence tending to establish the correctness of the finding as made. Every substantial conflict in the testimony is resolved in favor of the finding. (*Jacoby* v. *Feldman* (1978) 81 Cal.App.3d 432, 442 [146 Cal.Rptr. 334].)

■ Interpretation and application of statutes is a question of law, subject to our independent review. (*Service Employees Internat. Union* v. *County of Los Angeles* (1990) 225 Cal.App.3d 761, 774 [275 Cal.Rptr. 508].) The question of whether a practice is unfair under the Act is such a question, and we consider the issue de novo. (*Olsen* v. *Breeze, Inc.* (1996) 48 Cal.App.4th 608, 621 [55 Cal.Rptr.2d 818].)

## FACTS

In summarizing the facts, we rely on the trial court's extensive findings of fact. We summarize only those facts necessary to a determination of the legal issues on appeal, and generally do so as part of our review of each legal issue. We begin, however, with the preliminary facts necessary to an understanding of the case.

Duz-Mor is a clinical laboratory licensed by the state's Department of Health Services (the Department) to perform diagnostic testing of human blood, urine, and other specimens. Duz-Mor is also a Medi-Cal provider. The Medi-Cal program is administered by the Department, and in order to become a provider, a laboratory must apply to the Department and be accepted by that agency.

Clinical laboratories such as Duz-Mor may perform tests only when tests are ordered by a physician. Where patients will pay for their own tests, and for patients with insurance, physicians may bill the patient or third party payor. The physician may not mark up the laboratory charge. (Bus. & Prof. Code, § 655.5.) Pursuant to Medi-Cal requirements, Duz-Mor billed Medi-Cal directly for tests performed for Medi-Cal beneficiaries.

Between 65 and 70 percent of Duz-Mor's business involved Medi-Cal billing and an additional 10 to 15 percent involved Medicare billing. Duz-Mor also had private-pay patients, HMO (health maintenance organization) patients, and business which involved direct billing to patients.

The rules for Medi-Cal billing are found in Medi-Cal regulations and manuals. Medi-Cal reimburses laboratories such as Duz-Mor at fixed rates which are substantially less than retail rates. Under a regulation promulgated by the Department, Medi-Cal reimburses for laboratory tests at the least of four prices: the amount billed, the charge to the general public, Medicare's maximum allowance, or the amount set out in the regulation. (Cal. Code Regs., tit. 22, § 51529, subd. (a)(2).) On average, Medi-Cal reimbursement rates are 60 percent of the charges on Duz-Mor's schedule of fees.

The Department conducts routine audits of the amounts paid to providers like Duz-Mor for services to Medi-Cal beneficiaries, and may seek the return of any overpayment. (Welf. & Inst. Code, § 14170 et seq.) A provider is entitled to an administrative review of audit findings and to judicial review of the results of the administrative hearing. (Welf. & Inst. Code, § 14171, subd. (j); Code Civ. Proc., § 1094.5; *Physicians & Surgeons Laboratories, Inc.* v. *Department of Health Services* (1992) 6 Cal.App.4th 968, 973 [8 Cal.Rptr.2d 565].)

It was undisputed at trial that Duz-Mor's work was of a high quality. It was also undisputed that two of the practices challenged in the complaint, the payment of commissions for marketing services and the practice of giving discounts to physicians' private-pay patients, were common in the industry.

## Discussion

### I. *It is Neither Illegal Nor Unfair for a Clinical Laboratory to Offer Discounts to Physicians' Private-pay Patients*

#### A. *Facts*

The trial court found that many physician clients of Duz-Mor negotiated for discounts for tests performed for patients who paid for their own tests. The discount varied from doctor to doctor, and could amount to a reduction of 50 to 80 percent from Duz-Mor's fee schedule. In compliance with a Department directive, Duz-Mor informed the physicians that discounts must be passed along to patients. Duz-Mor's competitors gave similar discounts. Duz-Mor gave the discounts in order to compete with other laboratories, which also offered discounts and which sought such business from the same physicians.

Evidence at trial also established that HMO's negotiated for discounts for their patients, and that testing for private-pay patients constituted a small percentage of Duz-Mor's work.

## B. *Contentions*

### 1. *Unfair*

██ The test of whether a business practice is "unfair" for purposes of the Act " ' "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . ." ' An unfair business practice occurs when the practice ' "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." ' " (*Podolsky* v. *First Healthcare Corp., supra,* 50 Cal.App.4th 632, 647, citations omitted.)

██ Regarding both the practice of discounting and the practice of paying commissions for marketing services, discussed later in this opinion, the trial court found that "Duz-Mor engaged in the very same practices engaged in by other independent clinical laboratories, practices which were known to and accepted as appropriate by the federal and state regulatory agencies. Thus, there is no reason for the Court to conclude that the practices offended public policy, were unethical, oppressive, unscrupulous, or otherwise injurious to California health care consumers." We agree.

Appellant contends that the practice is injurious to consumers and has the potential of increasing costs to consumers, arguing that Duz-Mor must "make up the discounted prices somehow," perhaps through the performance of unnecessary work. We see no injury to consumers. First, there is no evidence in the record that Duz-Mor sought to "make up the discounted prices." Next, there is no possibility that any need or desire Duz-Mor might have had to increase revenues could result in the performance of unnecessary work. Duz-Mor may perform only those tests ordered by doctors, and the practice of lowering the prices paid by patients offers doctors no incentive to order unnecessary work.

Appellant argues that the practice offends public policy because it could cause physicians to choose laboratories for reasons other than the quality of work. It is perhaps theoretically possible that a doctor would refer work to a laboratory for reasons of low cost to certain patients, rather than quality, but we see no serious risk of that result. The evidence was that clinical laboratories are heavily regulated and that the industry is a highly competitive one. A laboratory which performed poor quality work would soon lose its customers, if not its license. We must also consider that doctors are licensed and regulated, and risk the loss of both license and patients if substandard work is performed.

In our view, the practice of negotiating discounts for physicians' private-pay patients benefits health care consumers. The lower prices are by law passed on to consumers. The evidence established that if discounts were not negotiated, private-pay patients would pay more for services than Medi-Cal pays on behalf of its beneficiaries, or than HMO's pay on behalf of their members. We can see no public policy benefit in such a result.

Finally, appellant argues that the practice is unfair to the public because Medi-Cal is not offered similar discounts. This argument, which seems to be at the heart of appellant's case, is wrong. The amount Medi-Cal pays for a test is governed by regulations promulgated by the Department. Under those regulations, Medi-Cal will pay no more than the lesser of the amount billed, the charge to the general public, Medicare's allowance, or scheduled amounts. (Cal. Code Regs., tit. 22, § 51529, subd. (a)(2).) Medi-Cal, not Duz-Mor, controls the amount Medi-Cal pays.

Appellant argues that the discounted prices are the "charge to the general public" for purposes of the regulation, so that Medi-Cal pays too much if it pays more than the discounted prices. Respondents dispute the contention, arguing that the discounts varied and the number of patients who received discounted prices was small. We need not resolve the issue here. If the Department believed that Medi-Cal paid too much, it was entitled to conduct an audit and defend that position in an administrative hearing. Nothing in the argument establishes that the offer of discounts to private-pay patients is unfair, immoral, or damaging to the public. We note in this regard that there was nothing clandestine or secretive about the discounts. Duz-Mor's computer system was programmed so that bills to each doctor included the discount for that doctor's patients. Nothing in the record indicates that the Department did not have access to that information.

### 2. *Unlawful*

The complaint alleged that the offer of discounts to physicians' private-pay patients violated two criminal laws, Welfare and Institutions Code section 14107.2, subdivision (b), and Business and Professions Code section 650. At trial, appellant also contended that the practice also violated title 22, California Code of Regulations section 51529, subdivision (a)(2) and section 51480.

#### *The statutes*

Appellant concedes that it is not illegal for a clinical laboratory to charge different amounts to private-pay patients or insurance companies, but

contends that under the statutes the practice becomes illegal when one of the purposes of the discounted prices is to obtain Medi-Cal business. Appellant further contends that Duz-Mor had that purpose here. We see no evidence of violation of either statute.

Business and Professions Code section 650 provides, in pertinent part, that "the offer . . . by any person licensed under this division of any . . . discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, . . . is unlawful." Duz-Mor was a person licensed under the division.

Similarly, Welfare and Institutions Code section 14107.2, subdivision (b) establishes criminal penalties for "(b) Any person who offers or pays any remuneration, including, but not restricted to, any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind . . . [¶] (1) To refer any individual to a person for the furnishing or arranging for furnishing of any service or merchandise for which payment may be made, in whole or in part [by Medi-Cal]."

Here, patients, not doctors, received the discount. There was no evidence that Duz-Mor offered any discount, remuneration, or any other benefit to a doctor as compensation or an inducement for referring patients.

Appellant speculates that by offering low laboratory fees for private-pay patients, physicians were able to obtain more such patients and were thus remunerated. Appellant presented no evidence that the discounts for private-pay patients were conditioned on the referral of a physician's Medi-Cal patients. Further, there was no evidence that private-pay patients choose their doctors based on the price of lab fees, or that any doctor who negotiated discounts found private-pay patients particularly lucrative.

We note that the Department has in the past agreed with this analysis. In 1982, the Department issued a document titled "Guidelines for Laboratory Management," which had the announced purpose of clarifying the Department's position on Business and Professions Code section 650. The document summarized a number of Attorney General opinions, and concluded that discounts were not unlawful as long as they were passed on to patients and were not based on the referral of a given volume of business. Appellant's investigator, Raymond Chang, testified that the discounts here were not conditioned on the referral of a given volume of business.

*The regulations*

Appellant further contends that the practice of discounting violated two regulations, title 22, California Code of Regulations section 51529,

subdivision (a)(2) and section 51480, subdivision (a). As the trial court found, section 51529 governs reimbursement, not billing. The regulation states that "Reimbursement for laboratory tests shall be at the least of the following . . . [¶] . . . [¶] (B) The charge to the general public." (Cal. Code Regs., tit. 22, § 51529, subd. (a)(2)(B).) Duz-Mor did not violate that regulation, since it does not control reimbursement.

Title 22, California Code of Regulations section 51480, subdivision (a) provides that "No provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service." Appellant argues that the discounted prices are the "usual fee . . . charged to the general public" for purposes of the regulation, although it does not specify which of the variety of discounts constitute the usual fee.[5]

In its request for statement of decision, appellant did not request a finding on this regulation, nor did it bring the omission of such a finding to the court's attention after the statement was issued. (Code Civ. Proc., §§ 632, 634.) We thus imply findings to support the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) The trial court had before it extensive evidence about Duz-Mor's pricing, constituting sufficient evidence for the implied finding that the discounted prices were not Duz-Mor's charge to the general public.

Appellant cites *Physicians & Surgeons Laboratories, Inc.* v. *Department of Health Services, supra,* 6 Cal.App.4th 968 for the proposition that the fees charged to private-pay patients are the "charge to the general public." From this proposition, appellant reasons that Medi-Cal paid too much and that Duz-Mor violated the regulations at issue.

In *Physicians & Surgeons*, the Department audited a laboratory and sought the refund of an alleged overpayment. The Department contended that the laboratory offered lower prices to "provider clients," such as physicians and clinics, than to third party payor clients, such as Medi-Cal. The laboratory agreed that it had two fee schedules, but argued that the practice was justified because of the greater administrative costs involving third party payors. The case reached the Court of Appeal after an administrative hearing which resulted in a finding for the Department and a reversal by the trial court. The Court of Appeal held that the Department's interpretation of the

---

[5]In its reply brief, appellant argues that Duz-Mor *can* legally claim its fee schedule amount when it files a claim with Medi-Cal, but then argues that the fee schedule amounts are fictitious and are designed to support a later claim by Duz-Mor that Medi-Cal has not paid enough. There was no evidence that Duz-Mor had made, or planned to make, any such claim.

relevant regulations was not arbitrary or capricious, and reversed the trial court. (6 Cal.App.4th at p. 973.)

The court rejected the laboratory's argument regarding administrative costs, and, in the holding cited here, also rejected the laboratory's argument that the fees charged to provider clients were not the fees charged to the general public (Cal. Code Regs., tit. 22, § 51529) and that the Department was not entitled to recovery under a regulation (Cal. Code Regs., tit. 22, § 51458.1, subd. (a)(2)) which allows the Department to recover amounts in excess of usual charges. The court found that "usual charges" included charges to provider clients, and that the Department's interpretation of "general public" to include provider clients was not clearly erroneous. (6 Cal.App.4th at p. 989.)

*Physicians & Surgeons* does not establish Duz-Mor's "usual fee charged . . . to the general public," or that Duz-Mor violated either of the regulations cited by appellant here.

## II. *Business and Professions Code Section 650 Does Not Prohibit Duz-Mor's Payment of Commissions for Marketing Services, but the Practice Does Violate Welfare and Institutions Code Section 14107.2, Subdivision (b)*

### A. *Facts*

██ Duz-Mor paid a sales commission to an independent contractor, Arthur Simburg, for his marketing services. For administrative purposes, Simburg's commission was at first calculated based on the percentage of the Medi-Cal and Medicare business he generated for Duz-Mor. As soon as advances in Duz-Mor's computer system permitted, Simburg's commission was based on all revenues he generated. The practice of using independent contractors for marketing services is common among clinical laboratories. While large laboratories often have an employee sales staff who are paid salaries, smaller laboratories such as Duz-Mor rely on independent contractors.

### B. *Contentions*

*Business and Professions Code section 650*

As we have seen, the Business and Profession Code prohibits "the offer [or] delivery . . . by any person licensed under this division of any rebate, refund, commission, . . . or other consideration . . . as compensation or

inducement for referring patients, clients, or customers to any person." (Bus. & Prof. Code, § 650.)

Duz-Mor did not make any payment for the referral of patients. Appellant contends, however, that the commissions paid to Simburg were compensation for the referral of clients or customers, that is, doctors. Appellant relies in part on *Mason* v. *Hosta* (1984) 152 Cal.App.3d 980 [199 Cal.Rptr. 859]. That case reviewed a contract between a doctor who provided hospitals with emergency room staff, and an administrator hired by the doctor to market those services to hospitals. Under the contract, the administrator was to be compensated according to the number of hospitals which contracted with the doctor. Reasoning that the hospitals became the doctor's "clients" or "customers" as the result of Mason's referrals, the Court of Appeal found that the contract violated Business and Professions Code section 650. (152 Cal.App.3d at p. 985.)

However, Business and Professions Code section 650 was amended after *Mason* to provide that "The payment or receipt of consideration for services other than the referral of patients which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished . . . ." Since Simburg did not refer patients, but solicited clients or customers, the exception applies here.

Appellant contends that the exception does not apply, citing in support the legislative history of the amendment.[6] That history indicates that the amendment was introduced at the behest of the California Association of Hospitals and Health Care Systems to address the holding of *Beck* v. *American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555 [260 Cal.Rptr. 237]. In that case, the plaintiff, a psychiatrist, entered into a contract with the defendant hospital to become its medical director. The contract permitted him to admit his patients to the hospital and fixed his compensation at a percentage of the room and board charged to all psychiatric inpatients at the hospital. The Court of Appeal held that since the contract provided the plaintiff with an inducement to admit his patients to the hospital, it violated Business and Professions Code section 650.

Appellant argues that since the statutory exception was enacted to address *Beck,* it only permits compensation for medical services based on a percentage of the revenues generated by those medical services, to the extent commensurate with the value of the services. We cannot so read the statute.

---

[6]We grant appellant's request that we take judicial notice of the legislative history, attached to appellant's reply brief.

As written, the exception is not limited to compensation for medical services, but applies to all "consideration for services other than the referral of patients." We see no ambiguity which would lead us to have recourse to legislative history. (*People* v. *Weems* (1997) 54 Cal.App.4th 854, 859 [62 Cal.Rptr.2d 903].) Even if we were to consider the history cited by appellant, we would find only that although the Legislature was inspired by *Beck*, it did not limit its enactment to the holding of that case.

Appellant further argues that respondents bore the burden of proving that Simburg's compensation was commensurate with the value of his services. Appellant cites in support several civil cases which hold that "[O]ne seeking to be excluded from the sweep of the general statute must establish that the exception applies." (*Barnes* v. *Chamberlain* (1983) 147 Cal.App.3d 762, 767 [195 Cal.Rptr. 417].) Appellant cites no authority which would shift the burden of proof on this criminal statute. The only evidence at trial was that Simburg's commissions were similar to those paid by other laboratories for marketing services. Appellant thus did not prove a violation of Business and Professions Code section 650, or, on this score, of the Act.

*Welfare and Institutions Code section 14107.2*

To restate, the Welfare and Institutions Code criminalizes the offer or payment of "any remuneration, including, but not restricted to, any kickback, bribe, or rebate . . . to refer any individual to a person for the furnishing or arranging for furnishing of any service," or "[t]o purchase, lease, order or arrange for or recommend the purchasing, leasing or ordering of any goods, facility, service or merchandise," for which payment may be made by Medi-Cal.[7] (Welf. & Inst. Code, § 14107.2.)

The trial court held that in order to establish a violation of this statute, appellant was required to prove that respondents intended to violate the statute. The court also found that the evidence established that respondents reasonably believed that the payment of commissions was legal, and thus found no violation of the statute.

In making its ruling, the trial court relied on *Hanlester Network* v. *Shalala* (9th Cir. 1995) 51 F.3d 1390 which interpreted 42 United States Code

---

[7]These restrictions do not apply to "[a]ny amount paid by an employer to an employee, who has a bona fide employment relationship with that employer, for employment with provision of covered items or services." (Welf. & Inst. Code, § 14107.2, subd. (c)(1).) It was undisputed that Simburg was an independent contractor, and not an employee, so that Duz-Mor did not fall under this exemption.

section 1320a-7b,[8] the federal Medicare antikickback statute. Welfare and Institutions Code section 14107.2 is based on that statute (*People* v. *Palma* (1995) 40 Cal.App.4th 1559, 1565 [48 Cal.Rptr.2d 334]), but they are not identical, most significantly in that the federal statute includes a requirement that the conduct be knowing and willful.

In *Hanlester*, the federal Department of Health and Human Services sought to exclude from the Medicare program several laboratories which paid remuneration to physician-investors to induce them to refer tests to the laboratories. The laboratories contended that the federal statute did not give fair warning of the standards by which their conduct would be judged. The court held that the statute was sufficiently definite, since "The statute regulates only economic conduct. It chills no constitutional rights. While the statute allows for criminal penalties, it requires 'knowing and willful' conduct, a requirement which mitigates any vagueness in the statute." (51 F.3d at p. 1398.) *Hanlester* further held that under federal law, "willful" requires proof of a specific intent to do something which the law forbids. (*Id.* at p. 1399; but see *U.S.* v. *Neufeld* (S.D. Ohio 1995) 908 F.Supp. 491, 497, [rejecting *Hanlester*'s definition of "willful" and holding that "[a] formulation of 'willful' which takes into account the purpose to commit a wrongful act is sufficient to eliminate the vagueness challenge"].) We see nothing in *Hanlester* which requires us to find that Welfare and Institutions Code section 14107.2 requires a specific intent to violate the law. *Hanlester* construed a different statute and even as to that statute, found only that an intent requirement was one element to be considered in a vagueness analysis.

Under relevant and well-established rules of statutory construction, we find that that Welfare and Institutions Code section 14107.2 does not require a specific intent to violate the law. First, we do not read into statutes provisions not placed in them by the Legislature. (Code Civ. Proc., § 1858.) The statute on its face does not require a specific intent unless the forbidden remuneration takes the form of a kickback. In that case, a "corrupt intent to unlawfully influence the person to whom [the remuneration] is given" is required. (Welf. & Inst. Code, § 14107.2, subd. (d).) The fact that our Legislature chose not to include the "knowing and willful" language of the federal statute, and specified that a corrupt intent is required only when a

---

[8]In pertinent part, that statute provides that "(b)(2) . . . whoever *knowingly and willfully* offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or services . . . or [¶] (B) to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item" for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony. (42 U.S.C. § 1320a-7b, italics added.)

kickback is involved, is a strong indication that the Legislature did not intend to require a specific intent to violate the law. (*Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 596 [262 Cal.Rptr. 46, 778 P.2d 174].)

We do not believe that the statute is unconstitutionally vague without such a specific intent requirement. The vagueness doctrine concerns due process: " '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' (*Connally v. General Const. Co.* [(1926)] 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322]; *Lanzetta v. New Jersey* [(1939)] 306 U.S. 451, 453 [59 S.Ct. 618, 83 L.Ed. 888]; *In re Peppers* [(1922)] 189 Cal. 682, 685-687 [209 P. 896].) A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it. (*Winters v. New York* [(1948)] 333 U.S. 507, 515-516 [68 S.Ct. 665, 92 L.Ed. 840]; *In re Peppers, supra,* 189 Cal. at 685-687; *People v. Building Maintenance etc. Assn.* [(1953)] 41 Cal.2d 719, 725 [264 P.2d 31]; *People v. Saad* [(1951)] 105 Cal.App.2d Supp. 851, 854 [234 P.2d 785].) A statute will be upheld if its terms may be made reasonably certain by reference to the common law (see *Connally v. General Const. Co., supra,* 269 U.S. at 391; *Lorenson v. Superior Court* [(1950)] 35 Cal.2d 49, 60 [216 P.2d 859]) or to its legislative history or purpose. (See *Connally v. General Const. Co., supra,* 269 U.S. at 391-392; *People v. King* [(1952)] 115 Cal.App.2d Supp. 875, 878 [252 P.2d 78].)" (*People v. McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974].)

 Here, the statute prohibits the offer or payment of "any remuneration . . . , directly or indirectly, overtly or covertly . . . either . . . [¶] (1) To refer any individual to a person for the furnishing or arranging for furnishing of any service or merchandise for which payment may be made, in whole or in part [by Medi-Cal]; or [¶] (2) To purchase, lease, order or arrange for or recommend the purchasing, leasing or ordering of any goods, facility, service or merchandise for which payment may be made, in whole or in part [by Medi-Cal]." (Welf. & Inst. Code, § 14107.2.)

The language of the statute cannot be said to be a model of clarity, precision, or elegance in writing. However, read as a whole, it is not sufficiently unclear or imprecise to infringe on due process rights. The statute prohibits payment of any kind of remuneration for the referral of persons for services which may be paid by Medi-Cal, or for arranging for such services to be furnished, or for recommending the purchase or order of

such a service. The commission payments made here are unquestionably remuneration. Respondents argue that the statute was not violated because Simburg could not refer patients to Duz-Mor. It is true that Simburg did not direct a patient to a laboratory in the way a doctor might refer a patient to a laboratory, or a lawyer might refer a client to a lawyer with a relevant specialty. However, the statute is not limited to those kinds of referrals. It encompasses not just referrals of patients to doctors, but referral of "individuals" to "persons" for the furnishing of "services" which may be paid for by Medi-Cal, or for arranging for such services to be furnished. The quoted terms are undefined, and are thus deliberately broad, and encompass a wide range of conduct relating to payments which result in an individual receiving services paid for by Medi-Cal. A person of common intelligence would understand that the statute prohibits payment of a commission to someone who arranges, through marketing activities, for services to be furnished to Medi-Cal beneficiaries.

Further, in determining vagueness we indulge in "certain necessary fictions," and require citizens to apprise themselves of such matters as legislative history, judicial decisions, and judicial decisions construing other statutes which use substantially similar language. (*People* v. *Antoine* (1996) 48 Cal.App.4th 489 [56 Cal.Rptr.2d 530]. 497.) "The required meaning, certainty and lack of ambiguity may appear on the face of the questioned statute or from any demonstrably established technical or common law meaning of the language in question. [Citation.]" (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].) We may thus certainly require that citizens apprise themselves of the entire statute in question. Here, in Welfare and Institutions Code section 14107.2, subdivision (b)(2), the statute prohibits payment for *recommendations* of services, quite clearly encompassing the kind of marketing conducted by Simburg.

Having found that commission compensation was unlawful, we need not determine whether it was unfair.

III. *The "Unbundled" Billing System Duz-Mor Employed for a Time for Certain Tests Was Neither Illegal Nor Unfair*

A. *Facts*

This contention concerns Duz-Mor's billing to Medi-Cal when a physician ordered certain tests for a Medi-Cal beneficiary. There is no allegation that Duz-Mor billed for any test which was not ordered by a physician or any test which was not actually performed.

The questioned billing practice took place when a physician ordered the chemistry tests found in a "Chemistry 19 panel" and an HDL cholesterol test. Before November of 1991, Duz-Mor billed Medi-Cal separately for the Chemistry 19 panel and the HDL test, but found that it was often not paid for the HDL test. In the fall of 1991, Duz-Mor discussed this problem with a Medi-Cal representative who visited Duz-Mor to assist with billing automation. A Chemistry 19 panel includes two tests, cholesterol and triglycerides, which constitute a lipid panel when performed with an HDL test. The Medi-Cal representative told Duz-Mor to bill the tests as a lipid panel and a chemistry panel which reflected the remaining tests ordered and performed, usually a Chemistry 16. Duz-Mor changed its billing practice in accord with those instructions. At least one Medi-Cal manual indicated that this was the correct procedure: when cholesterol, lipoprotein, HDL, and triglycerides are performed on the same patient on the same day, they are to be billed together as a lipid panel.

Sometime later, Duz-Mor was told by another Medi-Cal representative that the revised procedure was wrong, and the tests should be billed as Duz-Mor had originally billed them. Duz-Mor again changed its billing procedures.

## B. *Contentions*

Appellant contends that by billing separately for a lipid panel and a chemistry panel, Duz-Mor violated title 22, California Code of Regulations, sections 51529, subdivisions (b) and (e), and the False Claims Act, Government Code section 12651, subdivision (a). Appellant also contends that the practice was unfair. This time, we begin with an examination of the statute and regulation.

### *Unlawful*

Government Code section 12651, subdivision (a) sets forth civil penalties, including treble damages, against any person who commits specified acts involving false claims, including a person who "Knowingly presents or causes to be presented to an officer or employee of the state . . . a false claim for payment or approval."

The trial court found that Duz-Mor adopted the billing practice at issue here on the instructions of a Medi-Cal representative, and did not knowingly make a false claim. Appellant argues that the evidence "belies" respondents' claim that billing practices were changed in response to advice from a Medi-Cal representative. We interpret this argument as a challenge to the

sufficiency of the evidence for the finding, and find that the evidence is sufficient. It is true the parties stipulated that if called, the representative, Susan Kanne, would testify that she did not tell respondents to make the change in billing. However, Duz-Mor CEO Joe Morehead testified to the contrary. Since there is substantial evidence for the finding, we do not disturb it on appeal.

Appellant argues that lack of intent is not a defense to an Unfair Competition Act lawsuit such as this one. It is true that the Act does not require an intent to injure (*State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1102 [53 Cal.Rptr.2d 229]), but it is also true that the Act requires a violation of law, and that a defense to the underlying offense is a defense under the Act. (*People* ex rel. *Van de Kamp* v. *Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 763 [251 Cal.Rptr. 657].) Since appellant did not establish that respondents knowingly made a false claim, appellant did not establish a violation of Government Code section 12651, subdivision (a), and thus did not establish a violation of the Act.

We also see no violation of regulation. Title 22, California Code of Regulations sections 51529, subdivision (b) addresses reimbursement practices, and is not violated by any billing. Title 22, California Code of Regulations section 51529, subdivision (e) provides that "Any combination of two or more tests, in addition to those specified in (b), which are performed together on automated laboratory equipment shall be billed and reimbursed as an automated test." We see nothing in that subsection which prohibited Duz-Mor from billing several tests together as a lipid panel.

*Unfair*

Appellant argues that the practice was unfair because Duz-Mor received greater compensation for unbundled billing than it did under the alternative method, and that the practice was unfair to Duz-Mor's competitors, who billed correctly. We cannot agree. As the facts of this case indicate, the manuals and regulations which govern Medi-Cal billing are technical and complex, and are subject to different interpretations, even by representatives of Medi-Cal. There was no evidence about the billing practices of Duz-Mor's competitors, and an error in billing practices, if indeed there was one, cannot be said to be unfair under the Act.

### DISPOSITION

The judgment is affirmed insofar as it determines that Duz-Mor did not violate the Unfair Competition Act through either the offer of discounts to

physicians' private-pay patients or through use of the "unbundled" billing system, and that Duz-Mor did not violate the False Claims Act through use of the "unbundled" billing system. The judgment is reversed insofar as it determines that Duz-Mor did not violate the Unfair Competition Act through the payment of commissions for marketing services. The case is remanded to the trial court for further proceedings consistent with this opinion. Each party to bear its own costs on appeal.

Grignon, Acting P. J., and Godoy Perez, J., concurred.

Respondents' petition for review by the Supreme Court was denied February 24, 1999.