BILL LOCKYER Attorney General GREGORY L. GONOT Deputy Attorney General
THE HONORABLE JOSEPH L. DUNN, MEMBER OF THE STATE SENATE, has requested an opinion on the following questions:
1. May a physician prescribe for a patient a medical device that is distributed by a company in which the physician has an ownership interest?
2. If the physician may prescribe for a patient a medical device that is distributed by a company in which the physician has an ownership interest, may the company solicit physicians as investors in the company?
 CONCLUSIONS
1. A physician generally may prescribe for a patient a medical device that is distributed by a company in which the physician has an ownership interest, provided that any return on investment is based upon the physician's proportional ownership share and requisite disclosures are made.
2. Where a physician may prescribe for a patient a medical device that is distributed by a company in which the physician has an ownership interest, the company generally may solicit physicians as investors in the company.
 ANALYSIS
The two questions presented for resolution concern a physician's financial investment in a company that sells medical devices[1] to physicians, hospitals, and patients. The company manufactures and sells its own devices, or it purchases the devices from other manufacturers and resells them. The company does not provide any health care services aside from the manufacture and distribution of the devices. The company is not publicly held or traded and has a limited number of investors, most of whom are physicians who recommend and prescribe medical devices for their patients.[2] Company investors receive dividends based upon their proportional ownership interests; dividends are not based upon the number or value of any referrals made by the physicians, and no compensation is paid by the company to a physician for ordering a medical device. The investors are not directly involved in the management or operation or other activities of the company.
We are concerned here with whether the physician's investment in the company might affect his or her selection of a medical device because such selection will generate income for the company. As the company's orders increase, its profits and dividends and the value of the ownership interests would be expected to increase as well.
We are first asked whether a physician may prescribe for a patient a medical device that is distributed by a company in which the physician has an ownership interest as described above. If so, may the company solicit physicians as investors in the company? In answering these questions, we will assume that the devices have been prescribed by the physician, that they are useful in the treatment of the patient for a legitimate medical need, and that the physician has paid fair market value for his or her ownership interest.
1. Prescribing Medical Devices
Three separate statutory provisions must be examined to determine whether a physician may prescribe for a patient a medical device that is distributed by a company in which the physician has an ownership interest. The first is section 650 of the Business and Professions Code,[3] which provides in pertinent part:
 ". . . [T]he offer, delivery, receipt, or acceptance by any person licensed under this division . . . of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any membership, proprietary interest or coownership in or with any person to whom these patients, clients, or customers are referred is unlawful.
 "The payment or receipt of consideration for services other than the referral of patients which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished or with the fair rental value of any premises or equipment leased or provided by the recipient to the payer.
 "Except as provided in . . . Sections 654.1 and 654.2, it shall not be unlawful for any person licensed under this division to refer a person to any laboratory, pharmacy, clinic (including entities exempt from licensure pursuant to Section 1206 of the Health and Safety Code), or health care facility solely because the licensee has a proprietary interest or coownership in the laboratory, pharmacy, clinic, or health care facility; provided, however, that the licensee's return on investment for that proprietary interest or coownership shall be based upon the amount of the capital investment or proportional ownership of the licensee which ownership interest is not based on the number or value of any patients referred. Any referral excepted under this section shall be unlawful if the prosecutor proves that there was no valid medical need for the referral.
". . . . . . . . . . . . . . . . . . . . . . ."[4]
Thus, as pertinent here, section 650 prohibits: (1) the receipt or acceptance (2) by a physician (3) of any consideration as inducement (4) for the referral of patients (5) to any "person," irrespective of any proprietary or co-ownership interest the physician may have with the "person." (See 68 Ops.Cal.Atty.Gen. 28, 31 (1985).)[5]
In 77 Ops.Cal.Atty.Gen. 143, 144 (1994), we noted that the Legislature enacted section 650 to protect the public from excessive health care costs (Mason v. Hosta (1984)152 Cal.App.3d 980, 986), referrals based on considerations other than the best interests of the patients (Magan Medical Clinic v.Cal. State Bd. of Medical Examiners (1967) 249 Cal.App.2d 124,132; 82 Ops.Cal.Atty.Gen. 1, 4 (1999), deceit and fraud (63 Ops.Cal.Atty.Gen. 89, 91 (1980), and payment to a licensee where professional services have not been rendered (65 Ops.Cal.Atty.Gen. 252, 253 (1982)). In Beck v. American HealthGroup Internat., Inc. (1989) 211 Cal.App.3d 1555, 1564, the court observed:
 ". . . The statute was intended to prevent `the referring person [from being tempted] to suggest or prescribe extra, or more expensive services by the person to whom the patient is referred because the referring person's income is a function of the business he generates by referral.' [Citation.] The evil to be proscribed by section 650 `". . . is not just the payment for the referral, but also any relationship where the referral may be induced by considerations other than the best interests of the patient. . . ."' [Citation.] `Certainly a sick patient deserves to be free of any reasonable suspicion that his doctor's judgment is influenced by a profit motive.' [Citation.]"
In analyzing the requirements of section 650, we first consider whether there has been a "referral" of the patient in the circumstances presented. In 65 Ops.Cal.Atty.Gen. 252, supra, we examined whether section 650 would be applicable to a dental referral service in which a roster of dentists would be created from which persons would be told which dentists were located in their area. We stated:
 "The referral plan about which inquiry is made fits squarely within the section's broad prohibition. The verb `refer' is defined as `to send or direct for treatment, aid, information, decision' (Webster's Third New Internat. Dict. (1971 ed.) at p. 1907, def. (2a)) and a `referral' as `the process of directing . . . a patient . . . to an appropriate specialist or agency for definitive treatment' (id., at p. 1908, def. (1b)). The phrase `referral of patients' used in section 650 may thus be thought of as the process whereby a third party independent entity who initially has contact with a person in need of health care first selects a professional to render the same and then in turn places the prospective patient in contact with that professional for the receipt of treatment. In other words it is the selection of a dentist to provide professional services for a patient by someone other than the patient or dentist (or their employees or agents on their behalf) that constitutes the `referring of patients' under section 650." (Id. at p. 254.)
For purposes of this opinion, and in keeping with the broad prohibition of section 650, we will assume, without deciding, that in selecting a particular medical device for use by his or her patient, a physician is "referring" the patient to the company that supplies the device. (See People v. Duz-MorDiagnostic Laboratory Inc. (1998) 68 Cal.App.4th 654, 664; 84 Ops.Cal.Atty.Gen. 113, 114-116 (2001); 77 Ops.Cal.Atty.Gen.,supra, at p. 145.)[6] In effect, the physician would be directing his or her patient to the company for "aid" in connection with treatment even though the patient may receive the device at a hospital or elsewhere and may not have direct contact with the company.
We next turn to the requirement of "consideration" as "inducement" for purposes of section 650. Would the physician be receiving any consideration as an inducement for referring his or her patients to the company? In 68 Ops.Cal.Atty.Gen. 28, supra,
we addressed a similar situation where the physician was a limited partner in a clinical laboratory. We stated:
 "The use of the indefinite adjective `any' in the third element indicates that the section's coverage was meant to be very broad with respect to the types of consideration or inducements a physician might now receive for his or her referrals. [Citation.] The question therefore quite naturally arises as to whether [the third element] includes in its ambit a physician's expected return on his or her investment in a limited partnership that operates a clinical laboratory to which he or she refers patients since that amount, depending as it does on the profit margin of the enterprise, will surely be greater with the greater number of referrals received and a physician investing in such a laboratory will surely be tempted to refer patients to it for testing." (Id. at p. 31.)
Notwithstanding that possibility, we concluded that section 650 was not intended to prohibit a physician from referring patients to a facility merely because he or she might have an ownership interest in it and would thereby derive greater income from each referral. (Ibid.) In so concluding, we relied upon an earlier opinion, 16 Ops.Cal.Atty.Gen. 18 (1950), which was issued shortly after section 650 was originally enacted. In our 1950 opinion, we viewed a physician's ownership interest as follows:
 "It has been urged by some that section 650 prohibits a physician and surgeon from referring his patients to a concern in which he holds a partnership or owns corporate stock. We do not find any such prohibition in section 650.
 "The words `irrespective of' appear before the reference to membership, proprietary interest or co-ownership. The words `irrespective of' are defined by Webster as `without respect or regard to; independent of.' Therefore, the illegal rebating is forbidden without respect or regard to, or independent of, the fact that the physician may own an interest in the concern. Clearly, the provisions of section 650 do not prohibit a physician and surgeon from making legitimate investments in medical service establishments. Further, he is not prohibited from receiving a profit from such investments. However, if by subterfuge the company returns to the physician money or other consideration which is not the regular profit on his investment, then the same, undoubtedly being tied in to the amount of business the physician refers to the company, constitutes `kick-backs' or rebates. This the law specifically prohibits even though the same is accomplished by indirect means." (Id. at p. 22.)
We specifically addressed whether a group of physicians could form a partnership to operate a clinical laboratory to which they would refer their patients and from which they would receive any net operating profits at the end of the year. We stated with respect to the proposed arrangement:
 ". . . We are of the opinion that there is no violation of the provisions of section 650 set out in the above hypothetical case, provided that the division of profits to each physician and surgeon is not in any manner dependent upon or governed by the amount of referrals that said physician and surgeon has made to the laboratory. The profit distribution must be separate and apart from such referrals. Any arrangement that causes the percentage of the profits to vary, depending upon the number of referrals that may be made, would indicate that the individuals are endeavoring to commit the acts prohibited by section 650. The law prohibits `kick-backs' whether made openly or through subterfuge. Here, again, the ethical physician and surgeon will be very meticulous in making investments and in any connection he may have made with medical service enterprises so that profits which accrue to him from the same will not and cannot be interpreted as rebates." (Id. at p. 24.)
In 68 Ops.Cal.Atty.Gen. 28, supra, we presumed that the Legislature was aware of our 1950 opinion when it amended section 650 in 1971 to add what is now the third paragraph of the statute and that the purpose of the amendment was to codify our prior opinion's analysis. (Id. at p. 33.)
In a later opinion that year, 68 Ops.Cal.Atty.Gen. 140 (1985), we examined the requirements of section 654.2, a newly enacted patient referral statute, by placing the statute in its historical perspective:
 ". . . The section is the latest in a series of related attempts by the Legislature to protect the healing arts patient from untoward professional referrals. In 1949 the Legislature prohibited a healing arts practitioner from receiving any unearned compensation for patient referrals, but, with certain exception, still permitted a practitioner to have profit interests in health provider enterprises. (§ 650, fn. 2, post; 68 Ops.Cal.Atty.Gen. 28, 31 (1985); 16 Ops.Cal.Atty.Gen. 18 (1950).) Thereafter, in 1975 the Legislature essentially made it unlawful for certain practitioners (doctors, osteopaths, and dentists) to refer patients to enterprises in which they had certain interests unless they were disclosed to the patient beforehand. (§ 654.1, fn. 3, post.) Last year section 654.2 followed suit and now prohibits any division 2 licensee, i.e., any healing arts professional (cf. 66 Ops.Cal.Atty.Gen. 302, 305, 305, fn. 7 (1983) fn. omitted), from referring a patient (1) to any organization in which he or she has (2) a significant beneficial interest, unless the licensee (3) first discloses to the patient in writing the existence of such an interest and advises regarding other available alternatives. . . ." (Id., at p. 142, fn. omitted.)
Thus, at the time of our two 1985 opinions, a physician could lawfully refer a patient to a company in which he or she had an ownership interest provided that the distributing of the company's profits was not dependent upon the number of referrals that the physician made to the company and the physician complied with the relevant patient disclosure requirements. Since that time, section 650 has not been significantly amended so as to cause us to reach a contrary conclusion.
Here, the company's profits would be distributed based upon the physician's proportional investment interest in the company; the profits would not be contingent upon either the number or value of the referrals made. While the company's overall financial condition would be enhanced if numerous physicians were to refer their patients to the company for its products, that is beyond the reach of section 650. Hence, we find that section 650 would not prohibit a physician from prescribing a medical device that is distributed by a company in which he or she has an ownership interest.
The second statutory scheme we must consider is the Physician Ownership and Referral Act of 1993 (§§ 650.01, 650.02; "Referral Act"). Subdivision (a) of section 650.01 provides:
 "Notwithstanding Section 650, or any other provision of law, it is unlawful for a licensee to refer a person for laboratory, diagnostic nuclear medicine, radiation oncology, physical therapy, physical rehabilitation, psychometric testing, home infusion therapy, or diagnostic imaging goods or services if the licensee or his or her immediate family has a financial interest with the person or in the entity that receives the referral."
Section 650.02 grants various exceptions to the prohibition of section 650.01.[7] The Legislature has described its purposes in enacting the Referral Act as follows:
". . . . . . . . . . . . . . . . . . . . . . . . . .
 "(b) It is recognized by the Legislature that the referral of a patient by a health care provider to a provider of health care services in which the referring health care provider has an investment interest represents a potential conflict of interest.
 "(c) The Legislature finds these referral practices may limit or eliminate competitive alternatives in the health care services market, may result in overutilization of health care services, may increase costs to the health care system, and may adversely affect the quality of health care.
 "(d) The Legislature also recognizes, however, that it may be appropriate for providers to own entities providing health care services, and to refer patients to those entities, as long as certain safeguards are present in the arrangement.
 "(e) It is the intent of the Legislature to provide guidance to health care providers regarding prohibited patient referrals between health care providers and entities providing health care services and to protect the citizens of California from unnecessary and costly health care expenditures." (Stats. 1993, ch. 1237, § 1.)"
In 79 Ops.Cal.Atty.Gen. 225, supra, we noted "that [the Referral Act provisions] were to limit even further `referrals based upon considerations other than the best interests of the patients.'" (Id. at pp. 231-232.)
Assuming the physician's referral of a patient for a medical device does not involve any of the health care products or services described in section 650.01, subdivision (a), the referral would come within the terms of subdivision (f) of the statute, which state:
 "A licensee who refers a person to, or seeks consultation from, an organization in which the licensee has a financial interest, other than as prohibited by subdivision (a), shall disclose the financial interest to the patient, or the parent or legal guardian of the patient, in writing, at the time of the referral or request for consultation."
A proscribed "financial interest" includes "any type of ownership interest . . . between a licensee and a person or entity to whom the licensee refers a person for a good or service specified in subdivision (a)." (§ 650.01, subd. (b)(2).)
Beyond disclosure, however, we find nothing in the Referral Act that would prohibit a physician from referring a patient to a company in which he or she has an ownership interest as long as the referral is for a medical device that is not covered by section 650.01, subdivision (a).[8]
The third and final statute we must consider involves physician referrals in connection with health care services publicly funded under the Medi-Cal assistance program (see Welf. Inst. Code, §§ 14050-14685). Welfare and Institutions Code section 14107.2, subdivision (a), provides in relevant part:
 "Any person who solicits or receives any remuneration, including, but not restricted to, any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind either:
 "(1) In return for the referral, or promised referral, of any individual to a person for the furnishing or arranging for the furnishing of any service or merchandise for which payment may be made in whole or in part under this chapter or Chapter 8 (commencing with Section 14200); or
 "(2) In return for the purchasing, leasing, ordering, or arranging for or recommending the purchasing, leasing, or ordering of any goods, facility, service or merchandise for which payment may be made, in whole or in part, under this chapter or Chapter 8 (commencing with Section 14200) of this part, is punishable upon a first conviction by imprisonment in the county jail for not longer than one year or state prison, or by a fine not exceeding ten thousand dollars ($10,000), or by both the imprisonment and fine. A second or subsequent conviction shall be punishable by imprisonment in the state prison."
Here, the distribution of profits would not be influenced by whether, or to what extent, medical devices would be prescribed for patients. However, since the overall profits of the company might be expected to increase as the number of orders increased, would the physician be "indirectly" receiving remuneration in return for each referral?
To answer this question, we look to the federal Medicare anti-kickback statute (42 U.S.C. § 1320a-7b) upon which Welfare and Institutions Code section 14107.2 is largely based. (SeePeople v. Duz-Mor Diagnostic Laboratory, Inc., supra,
68 Cal.App.4th at p. 669; People v. Palma (1995)40 Cal.App.4th 1559, 1565.)[9] "Remuneration" includes sums for which no actual service is performed, as well as sums for which a service is performed. (Hanlester Network v. Shalala (9th Cir. 1995)51 F.3d 1390, 1401; U.S. v. Bay State Ambulance and Hosp. RentalServ. (1st Cir. 1989) 874 F.2d 20, 30.) The "in return for" language of the federal anti-kickback statute does not require that there be a quid pro quo involving a promise, contract, or agreement. (Hanlester Network v. Shalala, supra, 51 F.3d at pp. 1396-1397.)
The United States Department of Health and Human Services has issued implementing regulations defining the financial interests subject to the federal anti-kickback statute. The regulations specify that "remuneration" does not include any payment that is a return on an investment interest, such as a dividend or investment income, made to an investor as long as certain criteria are met. (42 C.F.R. § 1001.952, subd. (a).) For a smaller, non-publicly traded company like the one in question here, the following criteria are applicable:
 "(i) No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity. (For purposes of paragraph (a)(2)(i) of this section, equivalent classes of equity investments may be combined, and equivalent classes of debt instruments may be combined.)
 "(ii) The terms on which an investment interest is offered to a passive investor, if any, who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must be no different from the terms offered to other passive investors.
 "(iii) The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity.
 "(iv) There is no requirement that a passive investor, if any, make referrals to, be in position to make or influence referrals to, furnish items or services to, otherwise generate business for the entity as a condition for remaining as an investor.
 "(v) The entity or any investor must not market or furnish the entity's items or services (or those of another entity as part of a cross referral agreement) to passive investors differently than to non-investors.
 "(vi) No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12-month period may come from referrals or business otherwise generated from investors.
 "(vii) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor in the entity) must not loan funds to or guarantee a loan for an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity if the investor uses any part of such loan to obtain the investment interest.
 "(viii) The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor." (42 C.F.R. § 1001.952(a)(2).)
The federal regulations thus would allow an ownership interest by a physician in a company that distributes medical devices which the physician prescribes for patients if the specified requirements are met. If the investment is lawful under the federal anti-kickback statute and implementing regulations, we believe that Welfare and Institutions Code section 14107.2 would similarly allow the physician to prescribe the company's products under the same circumstances.
Accordingly, we conclude generally that a physician may prescribe for a patient a medical device that is distributed by a company in which the physician has an ownership interest, provided that any return on investment is based upon the physician's proportional ownership share and requisite disclosures are made.
2. Soliciting Physicians to Invest
The second question concerns whether a company may seek investors who are physicians who prescribe medical devices distributed by the company. Would such solicitations, if successful, cause the company to become dependent upon orders from investor physicians? Would the investor physicians be influenced by factors other than the best interests of their patients and give the company an unfair advantage over other medical device companies that do not similarly have "motivated" physicians as part owners?
The primary statutory scheme we must consider in answering this question is the Unfair Competition Law (§§ 17200-17210; "UCL"). The UCL prohibits "unfair competition," including "any unlawful, unfair or fraudulent business act or practice. . . ." (§ 17200;Korea Supply Co. v. Lockheed Martin Corp. (2003)29 Cal.4th 1134, 1143.) The UCL covers a wide range of conduct, embracing "`"`anything that can properly be called a business practice and that at the same time is forbidden by law.'"' [Citations.]" (Cel-Tech Communications, Inc. v. Los Angeles Cellular TelephoneCo. (1999) 20 Cal.4th 163, 180.) "It governs `anti-competitive business practices' as well as injuries to consumers, and has as a major purpose `the preservation of fair business competition.'" (State Farm Fire Casualty Co. v. Superior Court (1996)45 Cal.App.4th 1093, 1103, citing Barquis v. Merchants CollectionAssn. (1972) 7 Cal.3d 94, 110.) "Section 17200 `borrows' violations from other laws by making them independently actionable as unfair competitive practices. [Citation.]" (KoreaSupply Co. v. Lockheed Martin Corp., supra, 29 Cal.4th at p. 1143.) However, as explained in Cel-Tech Communications, Inc. v.Los Angeles Cellular Telephone Co., supra, 20 Cal.4th 163:
 ". . . [T]he law does more than just borrow. The statutory language referring to `any unlawful, unfair or fraudulent' practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. `Because Business and Professions Code, section 17200 is written in the disjunctive, it establishes three varieties of unfair competition — acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as `unfair' or `deceptive' even if not `unlawful' and vice versa."' (Citations.]" (Id. at p. 180, fn. omitted.)
A business practice can be "unfair" if it "offends an established public policy or . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (Podolsky v. First Healthcare Corp. (1996)50 Cal.App.4th 632, 647; see People v. Duz-Mor DiagnosticLaboratory, Inc., supra, 68 Cal.App.4th at pp. 662-663.) InDuz-Mor, the court considered whether it would be unfair for a clinical laboratory to offer discounts to patients who paid for their own laboratory tests. The court held that public policy would not be offended by the practice, reasoning in part:
 ". . . Appellant argues that the practice offends public policy because it could cause physicians to choose laboratories for reasons other than the quality of work. It is perhaps theoretically possible that a doctor would refer work to a laboratory for reasons of low cost to certain patients, rather than quality, but we see no serious risk of that result. The evidence was that clinical laboratories are heavily regulated and that the industry is a highly competitive one. A laboratory which performed poor quality work would soon lose its customers, if not its license. We must also consider that doctors are licensed and regulated, and risk the loss of both license and patients if substandard work is performed . . ." (Id. at p. 662.)
On the other hand, here, depending upon the manner in which physician investors are solicited (e.g., the type of promises made and the expectations created),[10] the company's solicitations could be seen as offending the public policy against creating incentives for physicians to make referrals based upon considerations other than the best interests of their patients.
However, an important limitation on the scope of the UCL is of particular relevance in the circumstances presented. In Schnallv. Hertz Corp. (2000) 78 Cal.App.4th 1144, 1154, the court observed:
 "Despite the sweeping language of the UCL, Cel-Tech
goes on to explain, the scope of a court's power under the law `is not unlimited.' [Citation.] `Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a "safe harbor," plaintiffs may not use the general unfair competition law to assault that harbor.' [Citation.]"
As noted in answer to the first question, under the federal Medicare anti-kickback statute and, by implication, under Welfare and Institutions Code section 14107.2, a company may have physician owners if their aggregate investments do not exceed a specified percentage of any class of investment interest and if they do not generate more than a specified percentage of the company's gross revenue relating to the furnishing of health care items. (42 C.F.R. § 1001.952(a)(2)(i)-(viii).) Compliance with the regulatory requirements would prevent the company from violating the law. An otherwise lawful business practice in compliance with the regulatory requirements would not be "unfair."[11]
Accordingly, we conclude that where a physician may prescribe for a patient a medical device that is distributed by a company in which the physician has an ownership interest, the company generally may solicit physicians as investors in the company.
[1] As used here, a "medical device" would include such products as prosthetics, implantable medical devices, and other durable medical equipment for which a prescription is required. (See Bus. Prof. Code, §§ 4022, 4023.)
[2] Under certain circumstances, a company issuing securities to its investors may be required to seek qualification of the securities by the California Corporations Commissioner. (See Corp. Code, § 25110; People v. Woolson (1960)181 Cal.App.2d 657, 671-672.) The application of California's securities laws is fact dependent and beyond the scope of this opinion.
[3] All references to the Business and Professions Code are by section number only.
[4] Sections 654.1 and 654.2 will be discussed below.
[5] A physician is "licensed under this division." (See §§ 2050-2079.) "Person," as used in section 650, includes business entities as well as individuals. (§ 653.)
[6] We do not consider here whether, and to what extent, a referral may be made to another health care provider, such as a hospital, where the medical device would be used in a surgical or out-patient procedure. Such an analysis would depend upon the particular facts concerning the physician's contractual arrangements with the other health care provider.
[7] Labor Code section 139.3 contains a separate but similar prohibition with respect to medical services obtained under the workers compensation system. (See 79 Ops.Cal.Atty.Gen. 225, 229-230 (1996).) Certain exceptions, none of which are based upon the type of ownership interest presented here, are set forth in Labor Code section 139.31.
[8] Federal law contains a similar referral prohibition statute (42 U.S.C. § 1395nn) that is applicable to the federal Medicare program.
[9] Unlike the federal statute, however, Welfare and Institutions Code section 14107.2 does not require a specific intent to violate the law. (People v. Duz-Mor DiagnosticLaboratory, Inc., supra, 68 Cal.App.4th at p. 669.)
[10] For example, if investors are solicited based upon a "team" concept whereby all physician investors would be expected to demonstrate product loyalty in order to make the venture successful, the practice could be deemed "unfair" or a violation of Welfare and Institutions Code section 14107.2.
[11] As previously discussed, pursuant to section 650.01, subdivision (f), a physician would be required to disclose his or her financial interest to the patient.